No. 25-231

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

UBER TECHNOLOGIES, INC., PORTIER, LLC
Plaintiffs,

And

MAPLEBEAR INC., doing business as Instacart,
Intervenor-Plaintiff/Appellant

v.

CITY OF SEATTLE,
Defendant/Appellee.

---

Appeal from the United States District Court
Western District of Washington at Seattle
District Court No. 2:24-cv-02103-MJP

---

**RESPONSE BRIEF OF APPELLEE CITY OF SEATTLE**

---

Jessica L. Goldman, WSBA #21856
Lawrence C. Locker, WSBA #15819
Jesse L. Taylor, WSBA #51603
Eva S. Oliver, WSBA #57019
SUMMIT LAW GROUP PLLC
315 Fifth Avenue South, Suite 1000
Seattle, WA 98104
Telephone: (206) 676-7000
*Attorneys for City of Seattle*

Ghazal Sharifi, WSBA #47750
ANN DAVISON
SEATTLE CITY ATTORNEY'S OFFICE
701 5th Avenue, Stuie 2050
Seattle, WA 98104
Telephone: (206) 684-8200
*Attorney for City of Seattle*

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................1

II.     JURISDICTION ....................................................................3

III.    ISSUES PRESENTED ..........................................................3

IV.     ORDINANCE PROVISIONS ...............................................4

V.      STATEMENT OF THE CASE ..............................................4

        A.      Instacart sells goods and services....................................4

        B.      The Ordinance. .................................................................6

                1.      The City Council's findings................................6

                2.      The Ordinance....................................................8

        C.      Seattle's robust legislative and rulemaking processes. .....................10

        D.      Instacart deactivates workers. .......................................10

        E.      Instacart is substantially regulated. ...............................13

        F.      Uber's last-minute lawsuit and Instacart's even-later
                joinder.............................................................................14

VI.     SUMMARY OF ARGUMENT............................................16

VII.    STANDARD OF REVIEW ..................................................18

VIII.   ARGUMENT........................................................................20

        A.      The court properly found Uber's claims are not likely to
                succeed. ..........................................................................20

        B.      Instacart's compelled speech claim is not likely to
                succeed. ..........................................................................20

                1.      The Ordinance is an economic regulation not
                        subject to First Amendment scrutiny........................21

                2.      The Ordinance does not trigger First Amendment
                        scrutiny...............................................................23

                3.      The Policy Provision is incidental to the
                        Ordinance's regulation of conduct..........................27

4.    If the First Amendment is implicated, the Policy Provision concerns commercial speech. ...............................34

5.    The Policy Provision satisfies rational basis review. .................................................................45

6.    The Policy Provision satisfies intermediate scrutiny ................................................................49

7.    The Policy Provision is not subject to, but also would satisfy, strict scrutiny ...................................52

C.    Instacart's vagueness claim is not likely to succeed. ........................58

1.    The court properly rejected Uber's vagueness arguments. ................................................................61

2.    Instacart's vagueness challenge fails. ...................................62

D.    Instacart is not likely to suffer irreparable harm. .............................67

E.    The equities do not favor Instacart, and an injunction would not be in the public interest. ...................................69

F.    The Ordinance is severable. ........................................................69

IX.    CONCLUSION ..........................................................................72

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aargon Agency, Inc. v. O'Laughlin*,
  70 F.4th 1224 (9th Cir. 2023) ................................................. 59

*Agency for International Development v. Alliance for Open Society*,
  570 U.S. 205 (2013) ............................................................. 25

*Am. Soc'y of Journalists & Authors, Inc. v. Bonta*,
  15 F.4th 954 (9th Cir. 2021) ................................................. 22

*Anderson v. City of Hermosa*,
  621 F.3d 1051 (9th Cir. 2010) ............................................... 26

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986) ............................................................. 21

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) ........................................... 37, 39

*Ariz. Attorneys for Criminal Justice v. Mayes*,
  127 F.4th 105 (9th Cir. 2025) ............................................... 20

*B & L Prods., Inc. v. Newsom*,
  104 F.4th 108 (9th Cir. 2024), *pet'n for cert. filed* (Dec. 3, 2024) ............. Passim

*Bd. of Trustees of State Univ. of N.Y. v. Fox*,
  492 U.S. 469 (1989) ............................................................. 52

*Bolger v. Youngs Drug Products*,
  463 U.S. 60 (1983) ........................................................... 35, 38

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1749 (2023) ..................... 19

*Cal. Tchrs. Ass'n v. State Bd. of Educ.*,
  271 F.3d 1141 (9th Cir. 2001) ........................................... 59, 60

*Central Hudson Gas and Electric Corp. v. Public Service Commission of New York*,
  447 U.S. 557 (1980) ......................................................... 49, 50

*Chamber of Com. of U.S. v. United States Sec. & Exch. Comm'n*,
  85 F.4th 760 (5th Cir. 2023) ............................................. 46, 48

iii

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984) ........................................................... 22

*CompassCare v. Hochul*,
  125 F.4th 49 (2d Cir. 2025) ............................... 36, 42, 45, 49

*Contest Promotions, LLC v. City & Cnty. of San Francisco*,
  874 F.3d 597 (9th Cir. 2017) ............................................ 51

*CTIA – The Wireless Ass'n v. City of Berkely*,
  928 F.3d 832 (9th Cir. 2019) ........................... 45, 46, 47, 67

*Edenfield v. Fane*,
  507 U.S. 761 (1993) .................................................... 40, 51

*El Centro De La Raza v. State*,
  428 P.3d 1143 (Wash. 2018) ............................................ 70

*Expressions Hair Design v. Schneiderman*,
  581 U.S. 37 (2017) ........................................................... 33

*First Resort, Inc. v. Herrera*,
  860 F.3d 1263 (9th Cir. 2017) .................................... 38, 50

*Fla. Bar v. Went for It, Inc.*,
  515 U.S. 618 (1995) .................................................... 35, 51

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ...................................... 18, 20

*Gerberding v. Munro*,
  949 P.2d 1366 (Wash. 1998) ............................................ 72

*Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*,
  800 F.2d 1514 (9th Cir. 1986) .......................................... 59

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999) .......................................................... 52

*Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) .......................................... 15

*Hill v. Colorado*,
  530 U.S. 703 (2000) .......................................................... 60

*HomeAway.com, Inc. v. City of Santa Monica*,
  918 F.3d 676 (9th Cir. 2019) ....................................... Passim

*Hotel Employees & Rest. Employees Intern. Union v. Nevada Gaming Com'n*,
  984 F.2d 1507 (9th Cir. 1993) .......................................... 54

iv

*Huss v. Heydt Bakery Co.*,
  108 S.W. 63 (Mo. 1908) ................................................................ 44

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) ............................................ 21, 24, 26

*Johnson v. United States*,
  576 U.S. 591 (2015) ............................................................... 65, 67

*Junior Sports Magazines Inc. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) ...................................................... 57

*Lake Butler Apparel Co. v. Sec'y of Labor*,
  519 F.2d 84 (5th Cir. 1975) ......................................................... 45

*League of Women Voters of Wash. v. State*,
  355 P.3d 1131 (Wash. 2015) .................................................. 71, 72

*Levi Strauss & Co. v. Shilon*,
  121 F.3d 1309 (9th Cir. 1997) ..................................................... 50

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ..................................................................... 51

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
  634 F.2d 1197 (9th Cir. 1980) ................................................ 68, 69

*Lydo Enters., Inc. v. City of Las Vegas*,
  745 F.2d 1211 (9th Cir. 1984) ..................................................... 68

*Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Md.*,
  91 F.4th 238 (4th Cir. 2024),
  *cert. denied*, 145 S. Ct. 152 (2024) .......................................... 41

*Menotti v. City of Seattle*,
  409 F.3d 1113 (9th Cir. 2005) ..................................................... 54

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
  460 U.S. 575 (1983) ..................................................................... 25

*Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*,
  971 F.3d 1021 (9th Cir. 2020) ..................................................... 59

*Nationwide Biweekly Admin., Inc. v. Owen*,
  873 F.3d 716 (9th Cir. 2017) ....................................................... 48

*Nat'l Ass'n for Fixed Annuities v. Perez*,
  217 F. Supp. 3d 1 (D.D.C. 2016) ................................................. 62

*Nat'l Ass'n of Wheat Growers v. Bonta*,
   85 F.4th 1263 (9th Cir. 2023) .............................................................. 32

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
   585 U.S. 755 (2018) .......................................................... 36, 42, 46, 54

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ................................................. Passim

*Nordyke v. Santa Clara Cnty.*,
   110 F.3d 707 (9th Cir. 1997) ............................................................ 50

*Pac. Coast Horseshoeing School, Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020) ......................................................... 53

*Pickup v. Brown*,
   740 F.3d 1208 (9th Cir. 2014), *partially abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755 (2018) ..................... 35, 36

*Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*,
   413 U.S. 376 (1973) ......................................................................... 26

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ......................................................................... 52

*Retail Digital Network, LLC v. Prieto*,
   861 F.3d 839 (9th Cir. 2017) ............................................................ 53

*Rumsfeld v. Forum for Academic & Institutional Rts., Inc.*,
   547 U.S. 47 (2006) ............................................................. 26, 31, 32

*San Francisco Apartment Ass'n v. City and County of San Francisco*,
   881 F.3d 1169 (9th Cir. 2018) ................................................. Passim

*Smith v. Helzer*,
   95 F.4th 1207 (9th Cir. 2024) ........................................................ 19

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................... 21, 22, 23, 24

*State v. Abrams*,
   178 P.3d 1021 (Wash. 2008) .......................................................... 70

*State v. Shorey*,
   86 P. 881 (Or. 1906) ....................................................................... 44

*Stephen v. Stevens*,
   21 N.Y.S. 721 (N.Y. Supreme Court 1893) ................................... 44

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022),
  *reh'g en banc denied,* 57 F.4th 1072 (9th Cir. 2023),
  *cert. denied*, 144 S. Ct. 33 (2023) ................................................................. Passim

*Tucson v. City of Seattle,*
  91 F.4th 1318 (9th Cir. 2024) ....................................... 58, 59, 60, 67

*UAW-Labor Emp't & Training Corp. v. Chao,*
  325 F.3d 360 (D.C. Cir. 2003) ...................................................... 43

*United KP Freedom Alliance v. Kaiser Permanente,*
  No. 21-cv-07894-VC, 2021 WL 5370951 (N.D. Cal. Nov. 18, 2021) ............... 54

*United States v. Caronia,*
  703 F.3d 149 (2d Cir. 2012) ......................................................... 53

*United States v. O'Brien,*
  391 U.S. 367 (1968) .................................................................... 26

*United States v. Ward,*
  No. CR-11-2123-RMP, 2013 WL 12203098 (E.D. Wash. Jan. 18, 2013) .......... 61

*United States v. Williams,*
  553 U.S. 285 (2008) ............................................................... 50, 58

*Valle Del Sol Inc. v. Whiting,*
  709 F.3d 808 (9th Cir. 2013) ................................... 37, 40, 51, 53

*Vidal v. Elster,*
  602 U.S. 286 (2024) .................................................................... 43

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
  455 U.S. 489 (1982) ........................................... 58, 59, 60, 61

*Volokh v. James,*
  656 F. Supp. 3d 431 (S.D.N.Y. 2023) ........................................ 25

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) .............................................................. 52, 59

*Williams-Yulee v. Fla. Bar,*
  575 U.S. 433 (2015) .................................................................... 43

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................................. 18, 69

*X Corp. v. Bonta,*
  116 F.4th 888 (9th Cir. 2024) ................................. 19, 32, 37, 53

*Yim v. City of Seattle*,
  63 F.4th 783 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 693 (2024)................ 31, 53

*Young v. Am. Mini Theatres, Inc.*,
  427 U.S. 50 (1976) ................................................................................. 60

*Zauderer v. Office of Disciplinary Counsel*,
  471 U.S. 626 (1985) ............................................................... 35, 36, 41

**Statutes**

29 U.S.C. §657(c)(3) ............................................................................. 44
29 U.S.C. §2102 ................................................................................... 44
29 U.S.C §2619(a) ................................................................................ 44
29 U.S.C §658 (b) ................................................................................ 44
42 U.S.C. §12115 ................................................................................. 44
Conn. Gen. Stat. §31-71f ...................................................................... 45
Haw. Rev. Stat. §388-7 ......................................................................... 45
N.C. Gen. Stat. §95-25.13 ..................................................................... 45
N.Y. Lab. Law §195(1)(a) ...................................................................... 45
N.Y. Lab. Law §203-e(6) ....................................................................... 44
RCW 46.72B.080 ................................................................................. 14
RCW 46.72B.080(1) ............................................................................. 30
RCW 46.72B.080(2) ............................................................................. 30
RCW 46.72B.090(4) ........................................................................ 14, 30
RCW 46.72B.110(1) ........................................................................ 14, 30
RCW 49.46.300(1)(iii) .......................................................................... 14

**Regulations**

29 C.F.R. §516.4 ................................................................................. 44

## I.    INTRODUCTION

Appellant Maplebear Inc. ("Instacart") challenges the City of Seattle's App-Based Worker Deactivation Rights Ordinance ("Ordinance").  It requires Instacart and like businesses to treat workers fairly by informing them of policies that may result in their deactivation from the company's platform, prohibits them from deactivating workers based on certain grounds, and provides workers with an internal appeal process to ensure fair application of its regulations.

The Seattle City Council comprehensively studied the treatment of app-based workers by Instacart and other companies whose business model is powered by worker delivery service.  Council Members heard from workers.  They held hearings and considered the companies' substantial feedback.  They reviewed empirical data and literature.  From this robust process, the Council learned that Instacart and other companies were deactivating workers based solely on algorithms and without notice, explanation, substantiation, or any internal appeal process.  Long-time workers lost their jobs with no recourse and devastating financial consequences that were suffered disproportionately by people of color.

Based on the Council's findings and its goal to provide basic due process to workers, the Ordinance was passed in August 2023, with an effective date of January 1, 2025.  For many months before the effective date, Seattle's Office of Labor Standards ("OLS") worked closely with all stakeholders, including Instacart,

to craft implementing regulations.  Instacart waited until the last minute to challenge the Ordinance, claiming it would suffer irreparable injury.

Instacart admits that Seattle may properly regulate the grounds for deactivating workers from Instacart's platform, including prohibiting Instacart from deactivating workers based solely on Instacart's algorithms.  Hence, Seattle may also require Instacart to adopt a conforming policy identifying what constitutes a violation that may result in deactivation.  Instacart disagrees.  Its position flies in the face of more than a century of worker protection laws that require employers to notify workers of their rights.

 Instacart's constitutional claims do not survive straightforward analysis.  The Ordinance does not require Instacart to speak any message, nor does it prohibit Instacart from speaking its preferred message.  Instead, based on well-supported reasons, it regulates Instacart's commercial decisions to deactivate workers such as those inconsistent with the company's own policies.  That Instacart must have a policy and provide that policy to its workers before deactivation is incidental to the law's intent and inevitable effect: its protection of workers from unwarranted deactivation.

Despite knowing for 16 months what the Ordinance provides, and that Seattle's administrative regulations are not yet in effect, Instacart joined in a last-minute preliminary injunction motion by Uber Technologies, Inc ("Uber") a few

days before the Ordinance took effect.  Following briefing and argument by Seattle and Uber, the district court determined that the Ordinance does not trigger First Amendment scrutiny because it regulates commercial conduct, not speech.  The court determined that the Ordinance does not restrict Uber's expressive association rights and that it is not unconstitutionally vague.  Accordingly, the court denied Uber's motion.  This Court should affirm.

## II.    JURISDICTION

Seattle agrees with Instacart's jurisdictional statement.

## III.    ISSUES PRESENTED

1.      The Ordinance regulates commercial conduct with only incidental impacts on speech.  Is it subject to First Amendment scrutiny?

2.      A regulation compelling commercial speech is subject to rational basis review.  If the First Amendment is implicated, is the Ordinance subject to, and does it satisfy, rational basis?

3.      If the Ordinance is not subjected to rational basis review, is it subject to, and does it satisfy, intermediate scrutiny?

4.      Regulations of commercial speech are not subject to strict scrutiny.  Is strict scrutiny proper and, if so, does Seattle satisfy it?

5.      Is the Ordinance unconstitutionally vague?

6.      If the policy provision is deemed unconstitutional, is the remainder of the Ordinance severable as Seattle intended?

7.      Should the Ordinance be preliminarily enjoined?

## IV.   ORDINANCE PROVISIONS

The Ordinance and the referenced provisions of the Seattle Municipal Code ("SMC") are reproduced in the Addendum.

## V.   STATEMENT OF THE CASE

### A.   Instacart sells goods and services.

Instacart is a publicly traded company that provides a delivery platform for connecting consumers with restaurants and grocers so they can buy and sell meals and groceries.  1-ER-105.  Purchasers download Instacart's application ("app") and place orders through it.  1-ER-106.  Instacart's app then matches buyers and sellers with workers who pick up and deliver the food.  *Id.*  The workers use the app and accept delivery requests when the worker is available.  *Id.*  On average, Instacart workers make $17 per hour.[1]  The average annual income for Instacart workers is between $15,000 and $39,362.[2]

According to Instacart, workers "are deeply valued members of the Instacart community" and the company "strive[s]" to protect workers "so they can continue

---

[1] https://www.indeed.com/cmp/Instacart-Shoppers/salaries (last visited Mar. 4, 2025).

[2] *Id.*

to deliver" goods for Instacart.[3]  But Instacart "may immediately terminate"

workers.[4]  It "reserves the right" to deactivate a worker "to ensure the safe and

reliable operation of the platform."[5]  "[I]n some instances," Instacart "may

temporarily suspend" workers.[6]

 Instacart recognizes that its rules for workers are subject to local laws.  For

example, the company prohibits carrying a weapon while providing services

"unless state law expressly prohibits this restriction."[7]  Instacart may conduct

background checks of workers "in compliance with applicable law[.]"[8]  It allows

workers to address background check issues "[i]n accordance with applicable

laws."[9]  If a worker fails to meet minimum safety standards, Instacart may

deactivate the worker "in accordance with applicable law."[10]

---

[3] https://investors.instacart.com/node/9186/ixbrl-viewer#i33b41ac41c074bce93057828cc5f97a4_16 at 5 (last visited Mar. 3, 2025).

[4] https://shoppers.instacart.com/contracts (last visited Mar. 6, 2025).

[5] https://www.instacart.com/help/section/4524023334676/360048057272 (last visited Mar. 4, 2025).

[6] https://shoppers.instacart.com/guidelines (last visited Mar. 4, 2025).

[7] *Id.*

[8] https://shoppers.instacart.com/contracts.

[9] https://shoppers.instacart.com/guidelines.

[10] *Id.*

-5-

Instacart says that deactivated workers "may submit an appeal directly with [its] Trust & Safety team, which thoroughly reviews any evidence provided."[11]  It is "committed" to "exploring new ways to protect the integrity of the Instacart platform for" workers.[12]

Instacart does business in a "highly competitive" market.[13]  It is "subject to a wide variety of complex laws and regulations in the United States[.]"[14]  The company experienced a nine percent increase in customer orders in 2024.[15]  It had revenue of $3,378,000 in 2024, up 11% from 2023.[16]

## B.    The Ordinance.

### 1.    The City Council's findings.

In August 2023, the Ordinance was passed.  Addendum-8.  Based on concerns of workers, robust input from Instacart and other companies, and Seattle's review and analysis of the data, the Ordinance aims to protect workers from unwarranted deactivations by app-based companies.  *Id.*

---

[11] https://www.instacart.com/company/shopper-community/ensuring-the-integrity-of-the-instacart-platform/ (last visited Mar. 6, 2025).

[12] *Id.*

[13] https://investors.instacart.com/node/9186/ixbrl-viewer#i33b41ac41c074bce93057828cc5f97a4_16 at 7.

[14] *Id.*

[15] *Id.* at 66.

[16] *Id.*

The Ordinance is based on the City Council's key findings and cites to the empirical data and literature on which it relied.  App-based companies typically assign and evaluate workers through algorithms and tracked data.  Addendum-9. Algorithmic management creates significant challenges for workers, including information asymmetries and extreme power imbalances between workers and companies.  *Id.*  Workers frequently do not know how they are evaluated by companies.  Algorithms dictating core aspects of workers' relationship with a company can change unexpectedly, leading to arbitrary evaluations and unwarranted deactivations.  *Id.*

The Council also found that workers are unilaterally deactivated without access to a fair process or responsive company personnel with the power to correct unwarranted deactivations.  *Id.*  Companies do not apply clear performance expectations or policies for deactivations and often deactivate workers without explanation or warning.  Addendum-10.  Workers are deactivated for low customer ratings, even though extensive research finds that consumer-sourced rating systems are highly likely to be influenced by racial bias and workers report deactivation based on customer harassment and false reports.  *Id.*  Moreover, many companies do not have processes to reconsider a deactivation based on a case-by-case human review and have little incentive to offer those processes.  *Id.*

The Council found that companies perform recurring background checks on workers. However, companies do not provide clear guidance on background check criteria, methods for evaluating the relationship of criminal history record information to the performance of app-based service, procedures for correcting background check information, or procedures for appealing deactivations based on background check information. Addendum-10-11. These problems are compounded by the high prevalence of background checks with errors, mismatched identities, and incomplete information due to scant oversight of background check information provided in the private market. Addendum-11. And law enforcement agencies commonly fail to update arrest or charge records with information about case outcomes. *Id.*

### 2. The Ordinance.

The Ordinance took effect January 1, 2025, and prohibits unwarranted deactivations. SMC 8.40.060(A). A deactivation is unwarranted unless it is based on a violation of the company's policy, which itself must be reasonably related to the company's safe and efficient operations. SMC 8.40.050(A)(4). The Ordinance proscribes grounds that are not reasonably related to safe and efficient operations. SMC 8.40.050(A)(2). The effect of these provisions is to prohibit deactivations based on these grounds.

If it wishes to deactivate workers, a company "must inform" workers "in writing" of the company's deactivation policy, "defining what constitutes a violation that may result in deactivation." SMC 8.40.050(A)(1). The policy "must be specific enough for" a worker "to understand what constitutes a violation and how to avoid violating the policy." *Id.* It is not required to say anything more. SMC 8.40.060(A).

Companies must "conduct a fair and objective investigation prior to deactivating" workers. SMC 8.40.050(A)(3). The company "must demonstrate by a preponderance of the evidence that the alleged violation of the network company's policy or rule occurred." SMC 8.40.050(A)(4). It "must apply the rule or policy, and penalty for violations, in a consistent manner." SMC 8.40.050(A)(5). Deactivation is prohibited if it "is intended to or results in discrimination[.]" SMC 8.40.050(B). Workers may challenge any deactivation. SMC 8.40.060. The company must review and respond to a challenge, SMC 8.40.060(B), inform workers of the reasons for deactivation, SMC 8.40.070, and provide workers the records on which the company bases a deactivation. SMC 8.40.080.

OLS cannot impose penalties on companies for an unwarranted deactivation nor enforce the investigation, confirmation of violation, consistent application,

proportionate penalty, or anti-discrimination provisions until June 1, 2027.  SMC 8.40.060(A), 8.40.130(B).

## C.    Seattle's robust legislative and rulemaking processes.

Instacart and other app-based companies opposed Seattle's consideration of regulations to protect workers from deactivation through algorithms and without notice, explanation, or ability to appeal deactivation to a person.  2-ER-181-183.[17] Once the Ordinance was adopted, Instacart and other app-based companies actively engaged with OLS.  SER-20, SER-36, 2-ER-158-162; Instacart Opening Brief "OB" at 12.  OLS proposed implementing rules last month and the public comment period ended last week.[18]

## D.    Instacart deactivates workers.

App-based workers "lack many formal workplace rights."[19]  For workers "who depend on an app in order to make a living, losing access to their account (or, being deactivated) is the equivalent of being digitally fired."[20]  Workers "are

---

[17] https://mynorthwest.com/mynorthwest-politics/seattle-city-council-passes-bill-limit-deactivation-app-based-workers/3918385 (last visited Mar. 3, 2025).

[18] https://www.seattle.gov/laborstandards/ordinances/app-based-worker-ordinances/app-based-worker-deactivation-rights-ordinance (cited by Instacart, OB-12) (last visited Mar. 4, 2025); www.seattle.gov/documents/Departments/LaborStandards/ABWDRO%20Proposed%20Rules_2_13_2025.pdf (last visited Mar. 4, 2025).

[19] *See* https://osf.io/preprints/socarxiv/w6z8e/download at 1 (cited by Instacart, OB-26) (last visited Mar. 6, 2025).

[20] *Id.*

frequently deactivated without notice, for issues that are out of their control (such as being rear-ended in a traffic accident), and with little to no information on how to get their account reactivated."[21]  Upon deactivation, Seattle workers face a "median time" of "approximately 11 weeks" out of work.[22]  "Deactivated drivers experience[d] severe financial and emotional harms."[23]  "Drivers of color and drivers who speak English as a second language experience[d] these harms most acutely."[24]

Before the Ordinance, Instacart abruptly kicked workers off its platform.  1-ER-111.[25]  It informed workers of deactivation by email.[26]  Workers had no meaningful way to obtain a response from Instacart upon challenging the deactivation.[27]  Appeals to Instacart were denied without explanation.[28]  Instacart's customer service phone number was available only to customers, not to workers.[29]

---

[21] *Id.*

[22] *Id.*

[23] *Id.* at 2.

[24] *Id.*

[25] *See* https://www.cnn.com/2021/04/30/tech/instacart-deactivations/index.html (last visited Mar. 3, 2025) (cited by the City Council, Addendum-10).

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

Its more than 500,000 workers were "at the mercy" of "the company's whims and often opaque or nonexistent processes to redress grievances."[30]  Without answers from Instacart, workers were "left trying to make sense of what happened."[31] Though Instacart says in its brief that "trust" is a critical part of its system, OB-10, workers could not trust Instacart.

At the time the district court rejected Uber's preliminary injunction motion, Instacart had various webpages describing its deactivation policies.[32]  It claims that as of January 1, 2025, it "was forced to publish a compliant deactivation policy." OB-54 (citing 1-ER-106).  To support this contention, it cites *only* to a declaration from 2024 in which an Instacart employee said: "As I understand it, to comply with the Ordinance, Instacart will have to say that certain behaviors are not 'reasonably related' to its 'safe and efficient operations.'"  1-ER-106.  Instacart also says "[i]t was forced to carry the City's message in its own voice."  OB-54

---

[30] *Id.*

[31] *Id.*; *see also* https://www.vice.com/en/article/we-are-devastated-instacart-is-deactivating-workers-and-they-dont-know-why/#:~:text=The%20Instacart%20spokesperson%20added%20that,needed%20to%20revoke%20the%20deactivation (last visited Mar. 3, 2025).

[32] https://shoppers.instacart.com/contracts; https://shoppers.instacart.com/guidelines.

(citing nothing).  But, since the district court denied Uber's preliminary injunction motion, Instacart **has not** changed its deactivation policies.  1-ER-107-110.[33]

### E. Instacart is substantially regulated.

Many regulations of app-based companies require the use of words.  For example, an ordinance required Instacart to have written agreements with restaurants for pick-up or delivery services.  Addendum-3.  Multiple ordinances require Instacart to provide workers with notices of rights.  SMC 8.37.070, .100; SMC 8.39.100.  As Instacart explains, it is subject to other regulation by Seattle.  OB-11.  Thus, when Instacart failed last year to pay 2,766 Seattle workers according to Seattle law, and to provide workers a required notice of rights, the

---

[33] Instacart's Access Guidelines, described by Instacart at 1-ER-107-109, have not changed since the Ordinance took effect.  *Compare* Instacart, *Full Service Account Access Guidelines*, https://shoppers.instacart.com/guidelines [https://perma.cc/CV4C-282V] (last visited Mar. 5, 2025) (showing Access Guidelines as of Mar. 5, 2025) *with* Instacart, *Full Service Account Access Guidelines*, https://shoppers.instacart.com/guidelines [https://web.archive.org/web/20241204024544/https://shoppers.instacart.com/guidelines] (link in brackets showing Access Guidelines captured by Wayback Machine as of Dec. 4, 2024).  Likewise, its Independent Contractor Agreement, described by Instacart at 1-ER-109-111, has not changed.  *Compare* Instacart, *Contracts*, https://shoppers.instacart.com/contracts [https://perma.cc/ZU3L-3J6W] (last visited Mar. 5, 2025) (showing Independent Contractor Agreement as of Mar. 5, 2025) *with* Instacart, *Contracts*, https://shoppers.instacart.com/contracts [https://web.archive.org/web/20241214103415/https://shoppers.instacart.com/contracts] (link in brackets showing Independent Contractor Agreement captured by Wayback Machine as of Dec. 14, 2024).

-13-

company had to pay the workers a financial remedy of $259,959 and $6,228 in fines to OLS.[34]

App-based companies are subject to state and federal regulation too.  For example, they "must adopt a policy of nondiscrimination," RCW 46.72B.110(1); a "zero tolerance policy" with respect to drugs and alcohol, which they must post to their websites, RCW 46.72B.080; a compliant background check policy, RCW 46.72B.090(4); and a compliant agreement.  RCW 49.46.300(1)(iii).

## F.    Uber's last-minute lawsuit and Instacart's even-later joinder.

Uber waited until 13 days before the Ordinance was to take effect to file its lawsuit and preliminary injunction motion.  2-ER-265, 2-ER-231.  On December 23, 2024, Seattle filed its opposition.  2-ER-194.  Only after Seattle filed its opposition did Instacart intervene.  1-ER-79.  Pursuant to the parties' agreement, 1-ER-144, and the district court's order, Instacart did "not submit any substantive briefing related to the temporary restraining order [motion] scheduled for a hearing on December 31, 2024[.]"  1-ER-78

Following oral argument, the district court rejected Uber's motion.  1-ER-9.  The court recognized that no discovery had yet been conducted and that it was "not strictly bound by the rules of evidence" and may consider hearsay and other

---

[34] https://www.seattle.gov/laborstandards/investigations/resolved-investigations/october-december-2024 (cited by Instacart, OB at 11) (last visited Mar. 4, 2025).

"evidence outside the normal rules of evidence."  1-ER-13; *see also Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).

The court rejected Uber's claims that the Ordinance compels speech in violation of the First Amendment and is unconstitutionally vague.  1-ER-13-19. With respect to Uber's compelled speech claim, the court found "that the Ordinance's requirements do little more than regulate conduct without any significant impact on speech or expression."  1-ER-15.  "To the extent the Ordinance implicates speech, it is incidental to its worker-related conduct goals." *Id.*  "To the extent Uber has to conform its policy to minimum standards, it is no different from ensuring regulatory compliance with anti-discrimination or workplace safety laws.  The focus remains on conduct, and any expressive impact is incidental."  1-ER-16.  As for Uber's claim that the word "reasonable" is vague, the court "join[ed] a host of federal courts who have rejected" the claim that this "ubiquitous" term is unclear.  1-ER-22.  "This is not a vagueness problem rather than a fundamental disagreement between Uber and the City" with respect to what the law should be.  1-ER-23.

Instacart appealed but made **no** changes to its deactivation policy.  *See, supra* n.33.  It abandoned Uber's preliminary injunction claim that the Ordinance violates any right to expressive association.  OB-13.  Instacart largely repeats the

-15-

other arguments Uber made to the district court.  Unlike Uber, Instacart challenges

only the constitutionality of the deactivation policy requirement, SMC 8.40.050(A)

(the "Policy Provision").

## VI.   SUMMARY OF ARGUMENT

**I.**   Instacart is not likely to succeed on the merits of its First Amendment claim.

    **a.**   The Ordinance regulates conduct by prohibiting Instacart from

deactivating workers for proscribed reasons and by granting workers the ability to

challenge unwarranted deactivations.  Any regulation of speech is merely

incidental to the Ordinance's regulation of unwarranted deactivations.  There is no

significant expressive element associated with Instacart's decision to deactivate

workers, and the Ordinance does not inevitably single out those engaged in

expressive activity.  Accordingly, under this Court's threshold inquiry, the

Ordinance is not subject to First Amendment scrutiny.

    **b.**   If the Ordinance does trigger First Amendment scrutiny, it is subject

to rational basis review because it regulates only commercial speech.  The Policy

Provision applies only in the context of a commercial transaction between Instacart

and its workers.  This transaction concerns providing services, not exchanging

ideas.  Instacart's primary motivation in retaining and terminating workers is

economic.  The Ordinance is also part of a long tradition of laws requiring

employers to disclose information to their workers about working conditions and

worker rights.  It satisfies rational basis review because it is reasonably related to Seattle's substantial interest in protecting workers from unwarranted deactivations and requires Instacart to provide workers with only factual and uncontroversial information about their rights.

     **c.**     If the compelled speech is deemed not purely factual and uncontroversial, intermediate scrutiny applies and is satisfied.  Seattle has a substantial interest in protecting workers from unwarranted deactivations.  The Ordinance directly advances that interest and is not more extensive than necessary to serve Seattle's interest.  Instacart has no First Amendment protection for false or misleading commercial speech.

     **d.**     The Policy Provision is not subject to strict scrutiny because it concerns commercial speech and is not a content-based regulation of core First Amendment speech.  Even if strict scrutiny applied, it is satisfied.  Protecting the health, safety, and welfare of workers is a compelling interest.  The Ordinance is narrowly tailored to advance this compelling interest by prohibiting Instacart from deactivating workers based on certain criteria and by providing workers with the tools and information necessary to challenge unlawful deactivations.

 **II.**   Instacart is not likely to succeed in showing that the Ordinance is impermissibly vague in all applications, as required to sustain its facial challenge.  The Ordinance gives companies like Instacart fair notice of what is prohibited and

does not invite arbitrary enforcement.  Instacart actively participated in the rulemaking process before the Ordinance was implemented and can clarify its meaning through administrative channels, mitigating any real confusion.  The Ordinance provides clear guidance as to what Instacart's deactivation policy may and may not contain, supported by pages of findings and empirical data.  The Ordinance is not unconstitutionally vague simply because Instacart disagrees with it.

**III.** Instacart offers no evidence that it is likely to suffer irreparable harm.  The balance of equities and public interest weigh against an injunction.

**IV.** To the extent the Policy Provision is unconstitutional, Instacart is not likely to succeed in showing that the entire Ordinance is invalid and cannot be severed. It contains a severability clause, demonstrating legislative intent that the law should survive any constitutional defect.  The Ordinance establishes many rights for workers that do not reference or rely on the Policy Provision.

## VII.   STANDARD OF REVIEW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  This Court's review of the denial of a preliminary injunction is "deferential," *Garcia v. Google, Inc.*, 786 F.3d 733, 739

(9th Cir. 2015) (en banc), for abuse of discretion. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1114 (9th Cir. 2024).

"A district court abuses its discretion if it rests its decision on an erroneous legal standard or on clearly erroneous factual findings." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (quotations & citations omitted), *cert. denied*, 143 S. Ct. 1749 (2023). The "appropriate legal standard to analyze a preliminary injunction motion requires a district court to determine whether a movant has established that (1) [it] is likely to succeed on the merits of [its] claim, (2) [it] is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in [its] favor, and (4) a preliminary injunction is in the public interest." *X Corp. v. Bonta*, 116 F.4th 888, 897 (9th Cir. 2024) (quotations & citation omitted). "If the trial court identified the correct legal rule, the second step is to determine whether the trial court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Cal. Chamber of Commerce*, 29 F.4th at 475 (quotations & citation omitted).

This Court will not "substitute [its] judgment for that of the district court, so [it] will not reverse the district court's order simply because [it] would have reached a different result." *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir. 2024) (quotations & citation omitted).

## VIII.  ARGUMENT

**A.  The court properly found Uber's claims are not likely to succeed.**

Likelihood of success on the merits "is the most important" factor when considering a preliminary injunction motion.  *Garcia*, 786 F.3d at 740.  "Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, [the court] need not consider the remaining three" elements.  *Id.* (quotations omitted).  The district court correctly held that Uber failed to show likelihood of success on its claims.  1-ER-13.  Instacart should fair no better on appeal.

**B.  Instacart's compelled speech claim is not likely to succeed.**

Instacart challenges a regulation of conduct aimed at protecting workers from unwarranted deactivation from its platform.  As the district court found, the Ordinance does not implicate the First Amendment.  1-ER-19.  Even if it did, it satisfies the rational basis scrutiny of compelled commercial speech and the intermediate scrutiny under which other commercial speech regulations are assessed.  Instacart's effort to trigger strict scrutiny fails.

Unlike Uber's contention at the district court, Instacart mounts a facial First Amendment challenge.  OB-53.  Instacart "must prove that the [Ordinance] applies unconstitutionally to a substantial amount of speech relative to its constitutional applications.  Only then can a court invalidate the [Ordinance] in all applications, including potentially constitutional ones not challenged in the case."  *Ariz.*

*Attorneys for Criminal Justice v. Mayes*, 127 F.4th 105, 107 (9th Cir. 2025).

Instacart has not satisfied this burden.

### 1.    The Ordinance is an economic regulation not subject to First Amendment scrutiny.

Instacart contends the Ordinance is a content-based regulation of speech subject to First Amendment scrutiny.  This is so, it asserts, because the Ordinance compels it "to speak publicly about the safety and efficiency of [its] platform[.]" OB-25.  Instacart reaches this conclusion by ignoring the intended and actual effect of the Ordinance, to regulate deactivations, which Instacart concedes is "conduct." OB-36; *accord* OB-37 ("Governments often forbid companies from taking actions against workers for specified reasons.").  The district court correctly determined that any burden on a company's speech is merely incidental to regulation of conduct and, therefore, First Amendment scrutiny is not triggered.  This Court should reach the same conclusion.

"[E]very civil and criminal remedy imposes some conceivable burden on First Amendment protected activities."  *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986).  But "'restrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct…. [T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.'"  *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015) (quoting *Sorrell v. IMS Health Inc.*, 564

-21-

U.S. 552, 567 (2011)).  "Consistent with this view, the Supreme Court has rejected First Amendment challenges to the Fair Labor Standards Act and its exceptions, the National Labor Relations Act, the Sherman Act, and taxes." *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 961 (9th Cir. 2021) (citations omitted) (statute "aimed at the employment relationship – a traditional sphere of state regulation" did not implicate First Amendment).

Instacart "bears the burden 'to demonstrate that the First Amendment even applies.'" *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 (9th Cir. 2024) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984)), *pet'n for cert. filed* (Dec. 3, 2024).  "To determine whether the First Amendment applies," the Court "must first ask the threshold question [of] whether conduct with a significant expressive element drew the legal remedy or the ordinance has the inevitable effect of singling out those engaged in expressive activity." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019) (quotations & citation omitted).  In conducting this inquiry, a "court may consider the 'inevitable effect of a statute on its face,' as well as a statute's 'stated purpose.'" *Id.* (quoting *Sorrell*, 564 U.S. at 565).

Instacart has ignored and cannot meet this burden.

-22-

## 2.    The Ordinance does not trigger First Amendment scrutiny.

The Ordinance's purpose is to "protect[] and promote[] public health, safety, and welfare by establishing protections against unwarranted deactivations for app-based workers."  Addendum-8.  Consistent with this purpose, it prohibits companies from subjecting workers to "unwarranted deactivation," SMC 8.40.060(A), defined as "deactivation that does not comply with Section 8.40.050." SMC 8.40.020

Section 8.40.050 requires companies to provide workers with fair notice of the company's deactivation policy, conduct "a fair and objective investigation prior to deactivating an app-based worker," "demonstrate by a preponderance of the evidence that the alleged violation of the network company's policy or rule occurred," "apply the rule or policy, and penalty for violations, in a consistent manner," and "account for mitigating circumstances, such as the app-based worker's past work history with the network company."  SMC 8.40.050(A)(3)-(6).

A company subjects a worker to an "unwarranted deactivation" if it is predicated on bases that are not reasonably related to the company's safe and efficient operations.  SMC 8.40.050(A)(2).  The Ordinance lists eight deactivation grounds that are explicitly unlawful and prohibits deactivations intended to or resulting in discrimination.  *Id.*; SMC 8.40.050(B).

-23-

It grants workers the right to challenge a deactivation through an internal company appeal. SMC 8.40.060(B). Companies must review and respond to a challenge within 14 days, including by substantiating the basis for the deactivation and responding to the worker's questions and claims. *Id.* Companies must provide workers the records the company relied upon to substantiate the deactivation and a written notice of rights. SMC 8.40.080, .090, .100. The stated purpose and "inevitable effect of the [Ordinance] on its face," *Sorrell*, 564 U.S. at 565, is to regulate nonexpressive conduct: the unwarranted deactivation of workers.

The conduct that "drew the legal remedy" of the Ordinance was the unwarranted deactivation of workers. *See supra* §V(B)(1). A company's deactivation of workers is a business transaction, and this Court repeatedly has held that "consummating a business transaction is nonexpressive conduct unprotected by the First Amendment." *B & L Prods.*, 104 F.4th at 114; *accord HomeAway.com*, 918 F.3d at 685 ("[T]he business agreement or business dealings associated with processing a booking is not conduct with a significant expressive element.") (quotations omitted); *Int'l Franchise Ass'n*, 803 F.3d at 408 ("A business agreement or business dealings between a franchisor and a franchisee is not conduct with a significant expressive element.") (quotations omitted).

Neither does the Ordinance "'singl[e] out those engaged in expressive activity' such as newspapers or advocacy organizations." *Int'l Franchise Ass'n*,

-24-

803 F.3d at 408 (quoting *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581 (1983)); *accord B & L Prods*, 104 F.4th at 116 (law prohibiting contracting for gun sales applies irrespective of "whether a party is engaged in" other speech). Rather, it regulates the business dealings between companies and workers. Its impact does not differ based on whether a company is engaged in any expressive activity, and it does not apply at all to parties who speak about the safe and efficient operations of app companies but do not facilitate work performed by app-based workers. *See HomeAway.com*, 918 F.3d at 686. The Ordinance thus stands in direct contrast to *Agency for International Development v. Alliance for Open Society*, to which Instacart cites, because the statute challenged there required an organization to "explicitly agree with the Government's policy to oppose prostitution" to receive federal funds. 570 U.S. 205, 213 (2013). Likewise, *Volokh v. James*, does not support Instacart's argument because the law at issue there compelled noncommercial speech by social media networks that are in the business of speech. 656 F. Supp. 3d 431, 443 (S.D.N.Y. 2023) (It "compel[led] a social media network" that is "directly engaged in the proliferation of speech" "to speak about the range of protected speech it will allow its users to engage (or not engage) in.").

"The ordinance, like a statute barring anti-competitive collusion … is not wholly unrelated to a communicative component, but that in itself does not trigger

First Amendment scrutiny." *Int'l Franchise Ass'n*, 803 F.3d at 408; *see also Anderson v. City of Hermosa*, 621 F.3d 1051, 1058 (9th Cir. 2010) ("The Supreme Court has consistently rejected 'the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'") (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  Companies necessarily carry out the conduct of deactivating workers through speech, but it "has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Academic & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) (quotations omitted).  Most economic regulations involve *some* communicative component, but that does not subject every economic regulation to First Amendment scrutiny.

Finally, it is of no constitutional significance that companies may not include in their deactivation policies the prohibited bases for deactivating workers. "Any First Amendment interest … is altogether absent when the commercial activity itself is illegal and the restriction … is incidental to a valid limitation on economic activity." *Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations*, 413 U.S. 376, 389 (1973); *accord Rumsfeld*, 547 U.S. at 62 (that antidiscrimination laws may prohibit employers from advertising "White

-26-

Applicants Only" "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct"); *HomeAway.com*, 918 F.3d at 686 (prohibition of advertising unauthorized short term rentals did not draw First Amendment scrutiny).

Companies have no First Amendment right to tell workers that they may be deactivated for a reason prohibited by law. There is no "significant expressive element" associated with a company's decision to deactivate workers, and the Ordinance does not have the inevitable effect of "singling out those engaged in expressive activity." *HomeAway.com,* 918 F.3d at 685. Accordingly, under the threshold inquiry that Instacart ignored, the Ordinance is not subject to First Amendment scrutiny. *B & L Prods.*, 104 F.4th at 116 (the inquiry is "complete").

### 3. The Policy Provision is incidental to the Ordinance's regulation of conduct.

Instacart makes no attempt to analyze the threshold question of whether First Amendment scrutiny applies. Instead, it ignores that the Ordinance regulates unwarranted deactivations and focuses exclusively on the Policy Provision in a vacuum, arguing that the Ordinance compels Instacart to speak the City's message. Instacart misrepresents the Ordinance, which regulates conduct with only an incidental effect on speech.

As a preliminary matter, it is necessary to address Instacart's mischaracterizations of the Ordinance. Instacart first asserts the Ordinance

requires it to "define behaviors related to 'safe and efficient operations.'"  OB-26.
The Ordinance contains no such requirement.  Rather, it imposes measures that a
company must adopt before engaging in the conduct of deactivating a worker.
SMC 8.40.050.  Companies like Instacart must inform workers of the company's
deactivation policy and define "what constitutes a violation that may result in
deactivation."  SMC 8.40.050(A)(1).  In other words, workers must be informed
about the circumstances that may result in their deactivation.  The policy that may
result in deactivation must be reasonably related to the company's safe and
efficient operations.  Companies are under no obligation to affirmatively "define
behaviors related to safe and efficient operations" in the policy or otherwise.

Similarly, Instacart asserts that the "Ordinance requires Instacart to
incorporate the City's list of exclusions," requiring it to "speak a message that is
partially dictated by the City itself."  OB-28.  But, again, the Ordinance contains
no such incorporation requirement.  The Ordinance prohibits deactivations based
on eight specific grounds, but it does not require companies to say anything at all
about those grounds, let alone "incorporate" them into the policy.[35]

---

[35] As discussed above, it is immaterial that Instacart may not represent it will
deactivate workers on  grounds prohibited by the Ordinance; there is no First
Amendment right to make false representations to workers about their legal rights.

The Ordinance neither "forces Instacart to speak about safety and efficiency," nor does it require the company to "contradict its own views on those subjects." OB-29. It does not "facially require[]" Instacart "to speak a specific message," as asserted by Amicus Chamber of Commerce of the United States ("Chamber"). Chamber Brf.-16. Rather, it prohibits companies from deactivating workers for certain reasons. If a company is going to engage in the conduct of deactivating a worker, it must demonstrate that the deactivation is not unwarranted by identifying a policy reasonably related to the company's safe and efficient operations that the worker violated. What is "reasonably" related to safe and efficient operations *does not* "require a company to make a value judgment" about anything. OB-37. Ignoring the specific examples of policies that would not be "reasonably related to safe and efficient operations" spelled out in the Ordinance, SMC 8.40.050(2), Instacart complains that "[s]afety and efficiency are not self-defining." OB-37. Apparently, they are as Instacart uses nearly identical language in its own policy where it "reserves the right" to deactivate a worker "to ensure the safe and reliable operation of the platform."[36]

Transportation network companies already are subject, without issue, to regulations like the Ordinance. For example, they must comply with the State of

---

[36] https://www.instacart.com/help/section/4524023334676/360048057272.

Washington's mandate that they "adopt a policy of nondiscrimination" and "notify" workers "of such policy." RCW 46.72B.110(1). Likewise, companies "must implement a zero tolerance policy regarding a driver's activities while accessing" the company's network. RCW 46.72B.080(1). The statute dictates what the company's policy must address, *but not how*. "The zero tolerance policy must address the use of drugs or alcohol while a driver is providing prearranged rides or is logged into the transportation network company's digital network but is not providing rides." *Id.* The statute does not dictate what the company is to say on this subject. Companies must "provide notice of this policy" "as well as procedures to report a complaint[.]" RCW 46.72B.080(2). The statute does not dictate what the procedure must say. Likewise, companies "must establish a clear background check policy consistent with the" statute "that informs drivers of any thresholds for categories of violations and any other factors which will result in a restriction of access to the driver platform." RCW 46.72B.090(4). What a compliant policy says is left to the company. Like the Ordinance, none of these laws require "value judgments" nor trigger the First Amendment. Without any constitutional impediment, they all require companies to create compliant policies "with [their] own words," governing economic conduct. OB-38.

The Court must consider the "context of the Ordinance as a whole," not "in a formalistic manner when such an interpretation would produce a result contrary to

the statute's purpose or lead to unreasonable results." *Yim v. City of Seattle*, 63 F.4th 783, 792 (9th Cir. 2023) (quotations & citations omitted), *cert. denied*, 144 S. Ct. 693 (2024).  SMC 8.40.050 does more than require a compliant policy if a company is going to deactivate workers.  Companies also must "conduct a fair and objective investigation prior to deactivating an app-based worker," "demonstrate by a preponderance of the evidence that the alleged violation … occurred," "apply the rule or policy, and penalty for violations, in a consistent manner," ensure that the "penalty of deactivation [is] reasonably related to the offense, and account for mitigating circumstances[.]"  SMC 8.40.050(A)(3)-(6).  These subsections – all of which regulate conduct – are part and parcel of the Ordinance's deactivation requirements.

The Ordinance's regulation of conduct also is similar to the law at issue in *Rumsfeld*, which required law schools to offer military recruiters the same access to their campuses provided to nonmilitary recruiters.  547 U.S. at 55.  If a law school engaged in the ***conduct*** of assisting students with access to nonmilitary recruiters by sending emails to students with factual information about recruiting activities, the school must provide the same information about military recruiters.  *Id.* at 60.  This "compelled speech" was "plainly incidental" to the law's regulation

of conduct.  *Id.* at 62.[37]  Here, too, any speech required by the Policy Provision is merely incidental to its regulation of unwarranted deactivations.

Instacart asserts that "safety and efficiency" is "part of its core identity," OB-29, transforming its deactivation policy into a "controversial" topic subject to "special First Amendment valence."  OB-27.  A subject does not become controversial simply because one has filed a lawsuit.  Moreover, the cases Instacart relied on in support of this argument concerned hate speech and misinformation, *X Corp.*, 16 F.4th at 899, harm to children, *NetChoice*, 113 F.4th at 1120, and messages "fundamentally at odds with [one's] mission."  *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1277 (9th Cir. 2023).  The basis upon which a company may terminate a commercial arrangement with a worker is unlike any of these things.

Furthermore, Instacart complains that the Ordinance will result in a loss of trust between its workers and its customers.  If Instacart cannot "tell users how it protects them from unsafe and inefficient users [sic] and behaviors," "users will have no reason to trust the platform, and the platform won't work as it's supposed

---

[37] Contrary to Instacart's understanding of *Rumsfeld*, the law at issue **did** "require[] the schools to make" an "affirmative statement."  OB-44-45.  That was precisely the point raised by the challengers of the law which the Supreme Court unanimously rejected.  The law required law schools to "assist[] military recruiters" by "provid[ing] some services, such as sending e-mails and distributing flyers, that clearly involve speech."  547 U.S. at 60.

to." OB-30. But the Ordinance does nothing to prevent Instacart from telling users how the company lawfully protects them. And, in any event, the "mere fact that a regulation may have economic implications for the feasibility of certain speech" is insufficient to invoke First Amendment scrutiny. *B & L Prods.*, 104 F.4th at 115.

That the Ordinance explicitly prohibits companies from deactivating workers on certain grounds distinguishes it from the law at issue in *Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017), relied on by the Chamber. The New York law at issue in *Expressions Hair Design* prohibited merchants from describing differential pricing for credit cards as a "surcharge." *Id.* at 44-45. Contrary to the Chamber's assertions, the New York law did ***not*** "certainly regulate[] conduct." Chamber Brf. at 11. Rather, the law said "nothing about the amount [merchants] are allowed to collect from a cash or credit card payer," only "how sellers may communicate their prices." 581 U.S. at 47. Merchants could utilize differential pricing for credit cards, but they could not communicate that differential pricing in the way they wished. Because the law regulated "the communication of prices ***rather than prices themselves***," it regulated speech. *Id.* at 48 (emphasis added). The Ordinance, in contrast, regulates conduct by limiting the circumstances in which a company may deactivate a worker.

The Chamber's reliance on *San Francisco Apartment Ass'n v. City and County of San Francisco*, 881 F.3d 1169 (9th Cir. 2018), is similarly misplaced. The "main purpose" of the ordinance at issue there was to "require[e] landlords to provide tenants with a statement of their rights" and "help the City collect data about buyout agreements." *Id.* at 1173-74. In other words, the intent and primary effect of the ordinance was to regulate commercial speech. Neither party disputed that First Amendment scrutiny was appropriate, so this Court did not engage in the threshold analysis. *Id.* at 1176-77. Neither the intent nor inevitable effect of the Ordinance is to regulate speech.

The Ordinance does not require companies to do anything more than implement a policy conforming with the Ordinance's regulation of commercial conduct if they wish to deactivate workers. Because Seattle's economic regulation is not subject to First Amendment scrutiny, Instacart's First Amendment claim fails.

### 4.    If the First Amendment is implicated, the Policy Provision concerns commercial speech.

If this Court finds the First Amendment implicated, it should conclude that the Policy Provision validly regulates commercial speech that is subject to lower scrutiny. "Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the

realm of noncommercial expression." *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 623 (1995) (cleaned up); *accord Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) ("Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, appellant's constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal.") (citations omitted).

Instacart points to *Bolger v. Youngs Drug Products*.  In that seminal case, the Court described the breadth of commercial speech: "an eight-page pamphlet discussing at length the problem of venereal disease and the use and advantages of condoms in aiding the prevention of venereal disease" was commercial speech though it did not expressly propose a transaction and the only commercial element was a statement that "'the pamphlet [was] contributed as a public service by … the distributor of Trojan-brand prophylactics."  463 U.S. 60, 62 n.4, 68 (1983).  *Bolger* emphasized that even speech about "important public issues" is entitled to less First Amendment protection when made in commercial transactions.  *Id.* at 67-68; *accord Ohralik v. Ohio State Bar Ass'n*, 436 U.S.447, 456 (1978) ("[T]he State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity."); *Pickup v. Brown*, 740 F.3d 1208, 1229 (9th Cir. 2014) ("When a drug is banned, for example, a doctor

who treats patients with that drug does not have a First Amendment right to speak the words necessary to provide or administer the banned drug."), *partially abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra ("NIFLA")*, 585 U.S. 755 (2018).

Nothing stops Instacart from explaining **in its policy** that the Ordinance prohibits it from deactivating workers for the stated reasons and that Instacart disagrees with the law. *Pickup*, 740 F.3d at 1230 ("Plaintiffs may express their views to anyone" about "sexual orientation change efforts." "The *only* thing" they cannot do is to "*practic[e]* SOCE on a minor patient."); *CompassCare v. Hochul*, 125 F.4th 49, 66 (2d Cir. 2025) (anti-abortion employers "remain free to share with their employees, in the handbooks or elsewhere, their moral, political, and religious views" opposing abortion, "their expectations for employees, and even their disagreement with the Act" that protects employees from discrimination for obtaining abortions).

Even if this Court were to credit Instacart's claim that a compliant policy would reveal Instacart's view on a "controversial" subject, OB-41, it is undisputed that this "speech" by Instacart is part and parcel of a commercial transaction between Instacart and its workers and should be subject to commercial speech scrutiny, if any. *Zauderer*, 471 U.S. at 637 n.7 (that appellant's commercial

statements, "in another context, would be fully protected speech … does not alter the status of the advertisements as commercial speech").

Employer speech related to the protection of workers is commercial speech. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1117 (9th Cir. 2021) ("Courts have found commercial speech" when it concerns "benefits to employee compensation, improvements to a brand's image, general exposure of a product, and protection of licensees' interests."); *San Franciso Apartment Ass'n*, 881 F.3d at 1176-77 ("[A] discussion between a landlord and a tenant about the possibility of entering into a buyout agreement is commercial speech, as it relates solely to the economic interests of the parties, and does no more than propose a commercial transaction."); *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 819 (9th Cir. 2013) ("The act of soliciting work as a day laborer may communicate a political message, but the primary purpose of the communication is to advertise a laborer's availability for work and to negotiate the terms of such work," which is "only commercial speech.").  The same is true of the Policy Provision.  Any regulated speech is commercial as it occurs within the context of, and is inextricably linked to, a commercial transaction between companies and workers.

Courts employ "a common-sense distinction between commercial speech and other varieties of speech." *X Corp.*, 116 F.4th at 900 (cleaned up).  This Court "recognize[s] that the commercial speech analysis is fact-driven," given the

-37-

"inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *NetChoice*, 113 F.4th at 1119 (quotations & citations omitted).  Common sense confirms that the Policy Provision is, at most, commercial speech that exclusively concerns terminating commercial contracts. *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017) ("[T]he potential commercial nature of speech does not hinge solely on whether the [plaintiff has] an economic motive, as even *Bolger* does not preclude classification of speech as commercial in the absence of the speaker's economic motivation.") (quotations & citation omitted).  Even where plaintiffs have not charged for their services, this Court has recognized that what is "more important[]" for confirming the commercial nature of the speech is that it occurs "in a commercial context and [is] directed at the providing of services rather than toward an exchange of ideas." *Id.*

"[I]n close cases," which this case is not, the Court "consider[s] the three factors identified in *Bolger*" "to determine if speech is commercial." *NetChoice*, 113 F.4th at 1119.  "[E]ach characteristic need not 'necessarily be present in order for speech to be commercial.'" *Herrera*, 860 F.3d at 1272 (quoting *Bolger*, 463 U.S. at 67 n.14).  The *Bolger* factors are whether the speech is an advertisement, it refers to a particular product or service, and the speaker's motivation is primarily economic.  *Id.*  The first factor is absent here, but the latter two are present – the

-38-

Policy Provision pertains only to Instacart's delivery service and its primary

motivation in retaining and terminating workers is economic. *Ariix*, 985 F.3d at

1116 (third *Bolger* factor "asks whether the speaker acted *primarily* out of

economic motivation"). Instacart is a publicly-traded company, answerable to its

shareholders.[38]  Instacart's claim that it has no "economic motive" here because it

"makes no money from deactivating a shopper's account" is unsupported and

absurd. OB-34. Instacart is in the business of making money for its shareholders

which is no less primary when it deactivates workers.[39]

In direct contrast, the statute challenged in *NetChoice*, to which Instacart

points, met "none of the three *Bolger* factors." 113 F.4th at 1120. That statute

required covered businesses to "***opine*** on potential ***speech-based*** harms to children,

including the **speech** of third parties, ***disconnected from any economic***

***transaction***." *Id.* at 1119 (emphasis added). This Court held the statute regulated

non-commercial speech because it forced businesses to "measure and disclose to

the government … the risk that children will be exposed to ***disfavored speech***

---

[38] https://investors.instacart.com/node/9186/ixbrl-viewer#i33b41ac41c074bce93057828cc5f97a4_16 at 66.

[39] Instacart points favorably to another Seattle law that prohibits specified policies just like the Policy Provision, SMC 8.37.080. OB-35. That law ***also*** regulates Instacart's policies: "A network company shall not … institute a policy subjecting an app-based worker to an adverse action, for engaging in the following activities …." SMC 8.37.080(A).

online." *Id.* at 1121 (emphasis added).  This ***disfavored speech*** "includes online

mental health resources and communities that many children turn to for support.  It

touches reporting about school shootings, war, climate change, and teen suicide."

*Id.* (citation omitted).

    *Valle del Sol* is instructive.  There, this Court held that a prohibition of

employment solicitation regulated commercial speech.

> [A] day laborer soliciting work … proposes a commercial transaction.
> Because the day labor provisions are explicitly limited to attempts to
> hire, hiring, picking up and transporting workers to work at a different
> location, all affected speech is either speech soliciting a commercial
> transaction or speech necessary to the consummation of a commercial
> transaction.

709 F.3d at 818.  Even if "day laborers convey vital political and economic

messages when they solicit work," "those messages are not inextricably

intertwined with the speech the day labor provisions regulate.  Nothing in those

provisions prohibits a worker from expressing his views publicly, nor is there any

reason such views cannot be expressed without soliciting work." *Id.*  "The act of

soliciting work as a day laborer may communicate a political message, but the

primary purpose of the communication is to advertise a laborer's availability for

work and to negotiate the terms of such work." *Id.* at 819.

    If the Ordinance impacts speech, it is commercial speech.  It exclusively

regulates commercial contracts for the delivery of goods.  *Edenfield v. Fane*, 507

U.S. 761, 767 (1993) (commercial speech is "linked inextricably with the

commercial arrangement that it proposes") (quotations & citation omitted);

*Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Md.*, 91 F.4th 238, 248 (4th Cir.

2024) (mandated literature regarding suicide risk for distribution in gun sales "does

not propose a commercial transaction," but "falls squarely in the scope of what is

understood to be commercial speech"), *cert. denied*, 145 S. Ct. 152 (2024).  Seattle

simply requires basic protections for Instacart's workers.  If Instacart wishes to

offer its opinions about any subject, the Ordinance does not stand in its way.  Its

website is full of these opinions today, uninterrupted by the Ordinance.

https://www.instacart.com/ (last visited Mar. 5, 2025).

Laws regulating commercial speech are generally "subject to a lesser

standard than strict scrutiny."  *NetChoice*, 113 F.4th at 1119.  Rational basis

applies to factual and noncontroversial disclosures.  OB-33.  "For all other

commercial speech, courts must apply a form of intermediate scrutiny[.]"

*NetChoice*, 113 F.4th at 1119; *accord Zauderer*, 471 U.S. at 638 ("Commercial

speech that is not false or deceptive and does not concern unlawful activities"

"may be restricted" subject to intermediate scrutiny.).  If the First Amendment is

implicated, the Ordinance need only satisfy rational basis.

Last month, the Second Circuit explained why rational basis, not strict

scrutiny, applied to a requirement that employers – including anti-abortion

employers – state in their employee handbooks the requirements of a law

-41-

prohibiting employment discrimination based on an employee's reproductive

health decisions.  The Court explained that the challenged notice provision

> is similar to many other state and federal laws requiring workplace
> disclosures – in employee handbooks or through other means, and by
> all employers or certain categories of employers – of health, safety,
> and civil rights information.  These notification requirements are so
> numerous that the New York State and federal Departments of Labor
> have compiled lists of them for employers' reference.

*CompassCare*, 125 F.4th at 65 (providing links to the referenced lists).

Additionally, "the [Supreme] Court has repeatedly recognized that there may

be categories of speech warranting lesser scrutiny under the First Amendment that,

while appearing novel, belong to a 'long (if heretofore unrecognized) tradition' of

restriction."  *Tingley v. Ferguson*, 47 F.4th 1055, 1079 (9th Cir. 2022) (quoting

*NIFLA*, 585 U.S. at 767), *reh'g en banc denied*, 57 F.4th 1072 (9th Cir. 2023),

*cert. denied*, 144 S. Ct. 33 (2023).  Seattle's Ordinance belongs to such a tradition

of laws regulating workplace rights and disclosures.

As this Court explained in *Tingley*, "in some circumstances, a seemingly

novel restriction on speech, even if content-based, may be tolerated, but only if

there is a 'long (if heretofore unrecognized) tradition' of that type of regulation …

and the category is not too broad."  *Id.* at 1080 (citation omitted).  This Court

found a long tradition of regulating "the practice of those who provide health care

within state borders," which the Court held offered an additional basis to apply

-42-

rational basis to Washington's law prohibiting health care providers from practicing conversion therapy on children. *Id.* at 1080-81.

Under *Tingley*, rational basis review is warranted in such cases for several reasons. For one, to ignore such a tradition would be to overlook the far-reaching consequences of a decision finding such a law unconstitutional. *Id.* at 1081 ("Otherwise, this would endanger other regulations on the practice of medicine where speech is part of the treatment."). But also, this tradition shows that burdens on speech by such regulations are acceptable. *Id.* at 1083 (highlighting the rationale behind longstanding restrictions on health care providers); *Vidal v. Elster*, 602 U.S. 286, 299 (2024) ("[D]espite its content-based nature, trademark law has existed alongside the First Amendment from the beginning. That longstanding, harmonious relationship suggests that heightened scrutiny need not always apply in this unique context."); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446 (2015) ("a history and tradition of regulation are important factors in determining whether to recognize new categories of unprotected speech") (quotations & citation omitted).

Here, the Ordinance belongs to a longstanding tradition requiring employers to disclose information to their workers about working conditions and worker rights. *UAW-Labor Emp't & Training Corp. v. Chao*, 325 F.3d 360, 365 (D.C. Cir. 2003) ("[A]n employer's right to silence is sharply constrained in the labor context, and leaves it subject to a variety of burdens to post notices of rights and risks.").

Governments have regulated what employers must communicate to workers since at least the 1800s. For example, an 1886 law "require[d] employers to keep posted, in every room where children under 16 years of age are employed, printed notices, stating the hours of labor required" by the employer. *Stephen v. Stevens*, 21 N.Y.S. 721, 722-23 (N.Y. Supreme Court 1893); *see also, e.g., State v. Shorey*, 86 P. 881 (Or. 1906) (1905 law required employers to "'post in a conspicuous place where such minors are employed, a printed notice stating the maximum work hours required in one week'"); *Huss v. Heydt Bakery Co.*, 108 S.W. 63, 65 (Mo. 1908) (1906 law required employers to post a notice of machine's "'dangerous character'"). A 1938 law requires employers to "post and keep posted a notice explaining the Act[.]" 29 C.F.R. §516.4. The Occupational Safety and Health Act of 1970 ("OSHA") requires employers to "promptly notify any employee who has been or is being exposed to toxic materials or harmful physical agents" and to "inform any employee who is being thus exposed of the corrective action being taken." 29 U.S.C. §657(c)(3); *see also* 29 U.S.C §658 (b) (requiring posting of citations). A 1988 law requires employers to give advance notice of impending layoffs. 29 U.S.C. §2102. The Americans with Disabilities Act of 1990 and the Family Medical Leave Act of 1993 require employers to communicate to their employees the statutes' rights and restrictions. 42 U.S.C. §12115; 29 U.S.C. §2619(a). Similar state laws are ubiquitous. *See, e.g., supra* §V(E); N.Y. Lab.

Law §203-e(6); Conn. Gen. Stat. §31-71f; Haw. Rev. Stat. §388-7; N.C. Gen. Stat. §95-25.13; N.Y. Lab. Law §195(1)(a); 43 Pa. Stat. §260.4.

Furthermore, First Amendment challenges to such laws have failed. *See, e.g.*, *CompassCare*, 125 F.4th at 53-54 (concluding under rational basis that a notice of rights requirement under a statute prohibiting discrimination based on employee reproductive health decisions was part of "a longstanding tradition in this country" supported by a "historical warrant"); *Lake Butler Apparel Co. v. Sec'y of Labor*, 519 F.2d 84, 89 (5th Cir. 1975) ("[I]f the government has a right to promulgate [OSHA] regulations it seems obvious that they have a right to statutorily require that they be posted in a place that would be obvious to the intended beneficiaries of the statute[.]  The posting of the notice does not by any stretch of the imagination reflect one way or the other on the views of the employer.  It merely states what the law requires.").

If scrutiny is warranted here, it should be under rational basis.

### 5.    The Policy Provision satisfies rational basis review.

Under either rational basis trigger, "compelled disclosure of commercial speech complies with the First Amendment if the information in the disclosure is [1] reasonably related to a [2] substantial governmental interest and is [3] purely factual and uncontroversial." *CTIA – The Wireless Ass'n v. City of Berkely*, 928

F.3d 832, 845 (9th Cir. 2019) (numbers added).  The Policy Provision satisfies these lenient requirements.

*First*, whether a compelled disclosure is "reasonably related" to the government's interest is a question left to legislators.  As this Court explained in *CTIA*, it is "not in a position to disagree" with legislators that a compelled disclosure is reasonably related to government interests.  *Id.* at 846.  The Policy Provision is reasonably related to Seattle's interests and backed by empirical data and social science research.  *See supra* §V(B)(1); *Tingley*, 47 F.4th at 1078-79 (the Legislature "rationally acted" in "relying on the body of evidence before it" and "recommendations of expert organizations"); *Chamber of Com. of U.S. v. United States Sec. & Exch. Comm'n*, 85 F.4th 760, 771 (5th Cir. 2023) (requirement that company provide information to consumers was reasonably related to government interest in promoting free flow of commercial information "because of a supposed asymmetry in information").

*Second*, a "substantial interest" is "more than trivial."  *CTIA*, 928 F.3d at 844.  It "'must remedy a harm that is potentially real not purely hypothetical[.]'"  *Id.* (quoting *NIFLA*, 585 U.S. at 776).  Seattle's interest in protecting workers from unwarranted deactivations is substantial.  *See San Francisco Apartment Ass'n*, 881 F.3d at 1177 (increasing the fairness of dealings between landlords and tenants is a substantial interest).

*Third*, the compelled statement must be factual and uncontroversial. Instacart does not dispute that the Policy Provision requires factual statements about the bases for deactivating workers. The sole element of rational basis review Instacart challenges is the asserted "controversial" nature of the compelled speech. OB-33. Instacart says the Ordinance compels speech about one of "the most controversial topics" based on four things, none of which show a controversy under the legal standard. OB-26. First, Instacart points to a lawsuit against Uber dismissed for failure to state a claim without any discussion of a controversy. *Id.* Second, Instacart mentions a University of Washington study that catalogs the companies' mistreatment of workers in Seattle and the benefits for workers of separate Seattle legislation. *Id.* Third, Instacart offers an article about a proposed Chicago law to help app-based workers. *Id.* And fourth, Instacart cites a summary of the Seattle Ordinance prepared by Seattle staff. *Id.* While each reference catalogues poor treatment by companies of their workers, none show any controversy as to the solutions to protect workers, including Seattle's Policy Provision. But more importantly, Instacart ignores the basic law that "any purely factual statement that can be tied in some way to a controversial issue is" not "for that reason alone, controversial." *CTIA*, 928 F.3d at 845. "'Uncontroversial' in this context refers to the factual accuracy of the compelled disclosure, not to its subjective impact on the audience. Thus, a disclosure may be purely factual and

-47-

uncontroversial although it disturbs the party being compelled to make the disclosure or disturbs its customers[.]" *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 732 (9th Cir. 2017) (quotations & citations omitted).  That Instacart is disturbed is of no consequence.

Even if the Policy Provision is deemed to require Instacart to opine about what is reasonably related to its safe and efficient operations, Seattle satisfies rational basis review.  For example, the Fourth Circuit rejected Instacart's argument as made in that case by amici here.  "Forcing a company to explain the reason for its actions is a purely factual disclosure." *Chamber of Com. of U.S.*, 85 F.4th at 769.  This is true even if the company says that it is "a topic they consider to be one of the most controversial corporate decisions" it can make.  *Id.* at 770; *accord San Francisco Apartment Ass'n*, 881 F.3d at 1177-78 (ordinance "requir[ing] landlords to provide tenants with a form that describes tenants' rights, … and lists the contact information for tenants' rights organizations" was a "purely factual" disclosure requirement).  That is precisely what the Ordinance does: it prohibits Instacart from deactivating workers in violation of the law and requires Instacart to advise workers of their rights in compliance with the Ordinance.

As mentioned, the Second Circuit has just rejected a claim by employers opposed to abortion regarding a statute that prohibited employers from discriminating against employees who obtained abortion services.  The Court

rejected plaintiffs' claims that the subject matter of the employment law was "controversial[.]"  "Of course, the policy judgment that motivated the Act may be 'controversial' in the same way that the policy judgments underlying Title VII, or minimum wage laws, are controversial.  But the existence and contents of the Act – and an employer's obligation to comply with it – is not itself controversial." *CompassCare*, 125 F.4th at 65.

The Policy Provision satisfies rational basis review.

### 6. The Policy Provision satisfies intermediate scrutiny

If rational basis does not apply because the compelled speech is deemed to be ***not*** purely factual and uncontroversial, then the Policy Provision must be tested under the intermediate scrutiny applicable to other forms of commercial speech regulation.  *NetChoice*, 113 F.4th at 1119.

General commercial speech regulation is evaluated under the four-part analysis of *Central Hudson Gas and Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980).  As a threshold matter, if the proscribed communication is misleading or related to unlawful activity, it is not protected by the First Amendment.  *San Francisco Apartment Ass'n*, 881 F.3d at 1177.  If the communication is neither misleading nor related to unlawful activity, the Court assesses three additional factors.  The government's interest must be substantial.

-49-

*Id.* The regulation must directly advance that interest. *Id.* And the regulation must not be more extensive than necessary to serve that interest. *Id.*

Instacart's claim fails at the threshold, which it ignored. OB-35. "[T]he Constitution affords no protection to false or misleading commercial speech." *Herrera*, 860 F.3d at 1271; *accord Central Hudson*, 447 U.S. at 563-64 ("The government may ban … commercial speech related to illegal activity."). The Ordinance restricts only ***unlawful*** communications: it precludes companies from saying they will deactivate workers in violation of the Ordinance. *United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."); *HomeAway.com*, 918 F.3d at 686 ("[A]ny First Amendment interest is altogether absent when the commercial activity itself is illegal[.]") (cleaned up); *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312-13 (9th Cir. 1997) ("Because the transaction underlying Shilon's offer, i.e. selling counterfeit goods, is unlawful, the offer itself is not afforded First Amendment protection."); *Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997) ("These proposals to engage in commercial transactions are not accorded First Amendment protection because the underlying transaction is illegal."). Instacart therefore cannot satisfy the first *Central Hudson* requirement, and its claim fails.

Even if the other *Central Hudson* factors were relevant, they too demonstrate that the Policy Provision satisfies the First Amendment. *First*, as discussed above, *see supra* §VIII(B)(5), Seattle's interest in protecting workers is substantial.

*Second*, the Ordinance directly advances Seattle's interest because it is supported by more than "mere speculation or conjecture" and "the harms it recites are real and … its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71. Seattle's burden is not heavy. It must show only that the Ordinance is not "based on mere speculation and conjecture." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561 (2001) (cleaned up). Although it has, Seattle need not produce empirical data to substantiate the need for the Policy Provision; it may rely on history, consensus, and common sense. *Fla. Bar*, 515 U.S. at 628. "It is well established that a law need not deal perfectly and fully with an identified problem to survive intermediate scrutiny." *Contest Promotions, LLC v. City & Cnty. of San Francisco*, 874 F.3d 597, 604 (9th Cir. 2017). Requiring that Instacart's deactivation policy comply with the Ordinance directly advances Seattle's interest. The notice provision is vital to evening the playing field and ensuring that workers can protect their rights.

*Third*, the final factor requires "a reasonable fit between the government's legitimate interests and the means it uses to serve those interests." *Valle del Sol*,

-51-

709 F.3d at 825 (cleaned up). The government need not use the least restrictive means, and the fit need not be perfect; it simply must be reasonable. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999). The law should "represent[] not necessarily the single best disposition," but a "proportion[ate]" one. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989); *accord Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989) (speech restriction does not fail intermediate scrutiny "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative"). Seattle meets this standard: without the Policy Provision, workers would not know why they may be deactivated, which is key to protecting workers from unlawful deactivations. *See San Francisco Apartment Ass'n*, 881 F.3d at 1177-78 (required disclosures by landlords to tenants advances government's substantial interest in increasing fairness of lease buyout negotiations).

The Policy Provision satisfies *Central Hudson*.

## 7. The Policy Provision is not subject to, but also would satisfy, strict scrutiny

Instacart claims the Policy Provision is subject to strict scrutiny solely because it is "a 'content based' regulation." OB-19. It relies on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). OB-24. But this Court "reject[ed] the notion that *Reed* altered *Central Hudson*'s long-standing intermediate scrutiny framework[.]"

*Pac. Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1074 (9th Cir. 2020) (quotations & citation omitted).

This Court has likewise rejected Instacart's fundamental argument. "[C]ontent-based restrictions of commercial speech are subject to intermediate scrutiny[.]" *Yim*, 63 F.4th at 793 n.14; *accord Valle del Sol*, 709 F.3d at 818 (applying intermediate scrutiny to "content-based restrictions on commercial speech"); *see also Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 847-48 (9th Cir. 2017) ("*Every* commercial speech case, by its very nature, involves both content- and speaker-based speech restrictions.") (favorably quoting *United States v. Caronia*, 703 F.3d 149, 180 (2d Cir. 2012) (Livingston, J., dissenting)).

None of the other cases Instacart cites regarding content-based regulations is apposite.  They involved parties who, unlike Instacart, stand at the center of the political stage and were compelled by law to opine or make statements on noncommercial matters.  In *X Corp.*, a social media company was required by statute to opine in reports to the government on "politically fraught" issues such as identifying "hate speech," "racism," "extremism," "radicalization," and "foreign political interference," and to state whether it would moderate such political content.  116 F.4th at 894, 899, 902.  Instacart is not required to opine on any subject, let alone core First Amendment speech.

Similarly, in *NetChoice*, the statute required companies to report to the government and "opine on potential speech-based harms to children, including harms resulting from the speech of third parties, disconnected from any economic transaction." 113 F.4th at 1119. This Court found the law required core First Amendment speech ***about speech***.

And in *NIFLA*, the Court evaluated a law requiring anti-abortion pregnancy crisis centers, contrary to their core mission, to provide their clients with a government-written script on free or low-cost abortions provided by the state. 585 U.S. at 766. Instacart has no such core mission.

Here, by contrast, the nominal speech required conveys only the permissible reasons for terminating a contract between workers and a for-profit business that does not provide a speech platform. Instacart is not being forced to speak on political – or any – issues nor to express any opinion. Strict scrutiny does not apply to Seattle's regulation of commercial speech.

Even if strict scrutiny applied, Seattle satisfies it. First, Seattle's interest in protecting the health, safety, and welfare of workers is compelling. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1143 n.57 (9th Cir. 2005) ("maintaining safety and security" is a compelling state interest); *Hotel Employees & Rest. Employees Intern. Union v. Nevada Gaming Com'n*, 984 F.2d 1507, 1517 (9th Cir. 1993) ("the welfare of casino employees" is a compelling government interest); *United KP*

-54-

*Freedom Alliance v. Kaiser Permanente*, No. 21-cv-07894-VC, 2021 WL 5370951, *1 (N.D. Cal. Nov. 18, 2021) (employer has a compelling interest in promoting the safety of workers).  Instacart agrees that it is critical to protect workers "so they can continue to deliver" goods for Instacart.[40]

Instacart's only argument that Seattle's interest is not compelling is based on a misrepresentation of the record.  According to Instacart, in adopting the Ordinance, Seattle "cited no data, studies, or empirical analysis suggesting that these workers were especially vulnerable."  OB-31.  To the contrary, the Ordinance begins with five pages of detailed findings describing the struggles and risks faced by Instacart's workers in a regime where Instacart wields all the power unfairly.  Addendum-8-12.  The data Instacart seeks is set forth there.

Several sources Seattle relied on bare special mention.  One is an article about Instacart.  Addendum-10 (citing

https://www.cnn.com/2021/04/30/tech/instacart-deactivations/index.html).  CNN described former Instacart worker Rachel Freedman's experience, among others.

> Despite numerous attempts to get the company to review her situation, including through social media, her account remains deactivated nearly a month later.  She learned through the app that her appeal was denied without further explanation.  A customer service number only exists for customers – not the platform's contractors, which are

---

[40] https://investors.instacart.com/node/9186/ixbrl-viewer#i33b41ac41c074bce93057828cc5f97a4_16 at 5.

directed to utilize a 24/7 chat function within the shopper app or communicate via email in the case of deactivations.

https://www.cnn.com/2021/04/30/tech/instacart-deactivations/index.html.

Another is the University of Washington study of Seattle workers relied on by Seattle *and Instacart*.  OB-26 (citing study, available at

https://osf.io/preprints/socarxiv/w6z8e/download, to generate its "controversy" claim).  The City Council explained:

> Without any warning, computer algorithms with no human review have been able to ban people from their ability to get work on the apps.  Many report being deactivated for reasons completely outside of their control.  Others never find out why they were deactivated at all.  When workers try to challenge their deactivation, they often report a lack of substantive response from companies and are given little recourse.
>
> The University of Washington recently released **a report about app-based ride-hail drivers facing deactivations,** which found that deactivations had widespread economic, emotional, and racial ramifications, and most workers did not know why they were deactivated or how to appeal the decision.

https://council.seattle.gov/2023/08/08/seattle-city-council-passes-first-in-the-nation-law-protecting-app-based-workers-from-unreasonable-deactivations/ (last visited Feb. 23, 2025).  If data were required to show a substantial interest – a

-56-

proposition for which Instacart offers no authority[41] – it is ample here and damning.

Second, the Ordinance is narrowly tailored.  If Instacart were not required to notify workers of the lawful bases for deactivation, the prohibition of certain deactivation practices would not be nearly as effective.  Instacart seeks to avoid this obvious conclusion **solely** by arguing that Seattle could have **only** addressed its substantial interest "by banning" unwarranted deactivations.  OB-32.  It defies logic to argue that **informing** workers of their rights does not advance Seattle's interests **further** than merely prohibiting Instacart's unfair conduct.[42]  The Policy Provision does not fail strict scrutiny because it is more effective than the sole alternative Instacart floats.

No matter the level of scrutiny, the Ordinance satisfies the First Amendment.

---

[41] Instacart cites *Junior Sports Magazines Inc. v. Bonta* in which this Court accepted as "substantial" the governmental interests without any supporting data. 80 F.4th 1109, 1117 (9th Cir. 2023).  The Court discussed data only with respect to narrowly tailoring.  *Id.*

[42] Instacart points favorably to another Seattle law protecting workers, SMC Chapter 8.37, arguing Seattle "could have done the same thing for 'unwarranted' deactivations."  OB-32.  That ordinance too requires Instacart to notify workers of information and their rights.  SMC 8.37.070, .100.

**C.    Instacart's vagueness claim is not likely to succeed.**

Instacart claims the Policy Provision is facially unconstitutionally vague.[43] It is not.

An ordinance is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. "The operative question under the fair notice theory is whether a reasonable person would know what is prohibited by the law." *Tucson v. City of Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024) (quotations omitted). As for arbitrary enforcement, "a law is void for vagueness if it lack[s] any ascertainable standard for inclusion and exclusion, thereby authorizing or encouraging the authorities [to] arbitrarily prosecute one class of persons instead of another." *Id.* (quotations omitted).

"The degree of vagueness that the Constitution tolerates … depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). Economic regulation is subject to a more lenient test as its subject matter is often narrow "and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant

---

[43] Instacart's challenge is facial. OB-53. An as-applied claim also would fail: Instacart has not argued, let alone shown, that the Policy Provision is vague as applied to any specific course of conduct it intends to follow.

legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process."  *Id.*; *Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1231 (9th Cir. 2023) (same); *see, e.g.*, *Go Leasing, Inc. v. Nat'l Transp. Safety Bd.*, 800 F.2d 1514, 1525 (9th Cir. 1986) (rejecting vagueness challenge; "if there were any doubt, it is certainly reasonable to expect that Go Leasing would have made efforts to investigate or to inquire with the FAA to determine if its conduct fell outside the bounds of the regulation").  To sustain a facial challenge to an economic regulation, "the complainant must demonstrate that the law is impermissibly vague in all of its applications."  *Vill. of Hoffman Ests*, 455 U.S. at 497; *Monarch Content Mgmt. LLC v. Arizona Dep't of Gaming*, 971 F.3d 1021, 1030 (9th Cir. 2020) ("Because at least some sufficiently definite applications are plainly possible, we need not consider the plaintiffs' hypotheticals about future enforcement.").

By contrast, "[w]hen First Amendment freedoms are at stake, courts apply the vagueness analysis more strictly."  *Tucson*, 91 F.4th at 1329.  Still, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward*, 491 U.S. at 794 (1989); *Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001) ("[E]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount

-59-

of vagueness."). Rather, where free speech rights are implicated, a statute is unconstitutionally vague on its face only if the "deterrent effect on legitimate expression is … both real and substantial" and "the statute is [not] readily subject to a narrowing construction by the state courts." *Tucson*, 91 F.4th at 1329-30 (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50 (1976)). "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quotations omitted); *see also Tingley*, 47 F.4th at 1089 ("For facial vagueness challenges, we tolerate uncertainty at the margins; the law just needs to be clear 'in the vast majority of its intended applications.'") (quoting *Cal. Tchrs. Ass'n*, 271 F.3d at 1151).

As explained above, Instacart's First Amendment freedoms are not affected. And indeed, Instacart's participation in the rulemaking process shows the Ordinance is precisely the type of economic regulation for which "the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry," mitigating any real vagueness concerns. *Vill. of Hoffman*, 455 U.S. at 498; *see, e.g.*, 2-ER-181-93 (Seattle convened stakeholder meetings, invited companies to provide feedback on drafts of the Ordinance, and revised it based on their input); SER-20, SER-36 (Instacart participated with OLS regarding proposed

implementing regulations).  But even assuming its free speech rights were implicated, Instacart's vagueness claim is unlikely to succeed.

### 1. The court properly rejected Uber's vagueness arguments.

Instacart asks this Court to disregard the district court's opinion as having missed the point on vagueness, suggesting the court erred by addressing whether the word "reasonable" is vague.  OB-48 ("the term 'reasonable' … was not the focus of the parties' due process arguments").  The court's opinion is correct in finding Uber – and now Instacart – is unlikely to succeed on its vagueness claim. In fact, in addressing the word "reasonable," the court was responding directly to a threshold argument ***raised by Uber***.

Uber advanced a two-part vagueness argument.  First, it claimed that by using the word "reasonable," the Ordinance fails to provide fair notice of what conduct is prohibited, specifically arguing "reasonable" has no commonly accepted meaning.  2-ER-254.  According to Uber, the language "reasonably related" to "safe and efficient operations" did "not solve the problem" inherent in the term "reasonable" because "[w]ithout a more precise definition of 'reasonably related,' [the Ordinance] provides no meaningful guidance at all."  *Id.*; *compare* OB-49 (claiming the court "missed the mark" because the problem is "not" that Seattle "failed to … specifically define 'reasonably related'").  This argument, as Instacart acknowledges, finds no support in the law.  *See e.g.*, *United States v. Ward*, No.

CR-11-2123-RMP, 2013 WL 12203098, at *4 (E.D. Wash. Jan. 18, 2013); *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 41 (D.D.C. 2016).  Then, Uber claimed vagueness based on the Ordinance's list of policies not reasonably related to safety or efficiency, arguing, "rather than clear up the confusion, that list only adds to it."  2-ER-254.

The court rejected each of Uber's arguments.  1-ER-22-23.

### 2.  Instacart's vagueness challenge fails.

In this appeal, Instacart abandons Uber's argument that the Ordinance is inherently vague because it uses the word "reasonable," pressing only Uber's argument that the Ordinance's list of examples renders the language "incomprehensible."  OB-4, OB-46, OB-49; Washington Food Industry Association ("WFIA") Brf. at 13 (the "reasonably related" language is "straightforward enough" but the Ordinance "muddies the waters with a list of policy grounds supposedly unrelated to safety or efficiency").  This argument fails for three reasons.

*First*, by enumerating a list of policies not reasonably related to safe and efficient operations, the Ordinance provides ***more***, not less, clarity.  While Instacart asserts (without any evidence, admissible or not) that "many" policies on the list "are things that any reasonable person would view as directly related to safety and efficiency," OB-46, it in fact points to just two proscribed policies (of the eight

listed) as creating confusion: (1) "criminal background checks and driving records" and (2) "quantitative metrics derived from aggregate customer operations[.]"  OB-50.  In so arguing, Instacart misrepresents both provisions – suggesting that aggregate customer ratings and criminal background checks or driver records cannot be considered – and ignores that the Ordinance describes precisely why it imposes *qualified* constrains on a company's use of either policy.  Here are those proscribed policies, in full: (1) "[a]ny policy that would result in deactivation based *solely* on a quantitative metric derived from aggregate customer ratings of an app-based worker's performance" and (2) "[a]ny policy that would deactivate a worker based on the results of a background check, consumer report, driver record, or record of traffic infractions, *except in cases of egregious misconduct or where required by other applicable law*."  SMC 8.40.050(A)(2) (emphasis added).

The Ordinance does not prevent companies from ever deactivating workers based on background checks or driving records; the carveout for "egregious misconduct," includes, as one example, accruing three or more non-criminal moving violations in the past three years.  SMC 8.40.020.  Likewise, the Ordinance does not preclude Instacart from considering customer ratings – it requires only that Instacart not rely "solely" on a quantitative metric derived from aggregate customer ratings.  The Ordinance also explains *why* these policies are not "reasonably related" to safe and efficient operations through five pages of findings

supported by empirical data.  Addendum-8-12; *see also* OB-10 (acknowledging that "the Ordinance aims to address the City's concerns about 'algorithmic management'").  While Instacart describes the Ordinance as akin to defining "processed snack foods" to include "blueberries," OB-50, its hypothetical is not remotely comparable (unless perhaps the hypothetical ordinance was supported by pages of findings with legitimate scientific research uncovering that most blueberries were, in actuality, processed).

Nor is the Ordinance silent as to what sorts of policies are allowable.  It permits companies to immediately deactivate workers who have engaged in "egregious misconduct," SMC 8.40.050(C), and defines "egregious misconduct" to include, *inter alia*, behaviors that endanger physical safety, intentionally cause economic harm, or are threatening, harassing, or abusive, SMC 8.40.020.[44]

Instacart is not likely to succeed in proving the Ordinance became vague as to what a policy may or may not contain by offering a clear list of prohibited policies with exceptions and explanations.  The Policy Provision is, at least, "clear in the vast majority of its intended applications."  *Tingley*, 47 F.4th at 1089 (quotations omitted).

---

[44] WFIA also overlooks this provision in claiming that the Ordinance prohibits deactivations of "unreliable or dangerous shoppers." WFIA Brf. at 14.

-64-

*Johnson v. United States*, 576 U.S. 591 (2015), cited by Instacart, is inapposite. *Johnson* involved a criminal sentencing statute that increased penalties for "any crime … that … is burglary, arson, or extortion, involves use of explosives, ***or otherwise involves conduct that presents a serious potential risk of physical injury to another***." *Id.* at 594 (emphasis added). At issue was whether the residual clause (italicized above) was unconstitutionally vague. *Id.* The Court concluded that multiple uncertainties, working together, made the clause vague. *Id.* at 602. Principally, it was unclear how to estimate risk posed by a crime or how much risk it took for a crime to qualify. *Id.* at 597-98. This lack of clarity was demonstrated by the Court's own persistent inability to apply the clause consistently, and with grave consequences for those facing years of incarceration:

> Nine years' experience trying to derive meaning from the residual clause convinces us that we have embarked upon a failed enterprise. Each of the uncertainties in the residual clause may be tolerable in isolation, but "their sum makes a task for us which at best could be only guesswork." Invoking so shapeless a provision to condemn someone to prison for 15 years to life does not comport with the Constitution's guarantee of due process.

*Id.* at 601–02 (citation omitted). In addition, the Court observed that the examples preceding the residual clause created confusion because "the act of making an extortionate demand," for example, "does not, in and of itself, normally cause physical injury." *Id.* at 596.

-65-

The Ordinance involves none of the features that made the statute in *Johnson* unconstitutionally vague. It does not impose criminal penalties. There is not a many-year history of courts unable to find coherence in its meaning. And unlike the "confusing list of examples" in *Johnson*, the Policy Provision lists per se unreasonable policies that are comprehensible (whether or not Instacart agrees with them), explained by the Ordinance's text, and consistent with its stated purpose.

*Second*, the record shows that Instacart understands the Ordinance's restriction of deactivations to "safety and efficient operations"; it simply disagrees with it. (Instacart uses nearly identical language in its own policy where it "reserves the right" to deactivate a worker "to ensure the safe and reliable operation of the platform.")[45]

*Third*, companies, including Instacart, participated extensively in the legislative process. Instacart offers only one citation (apart from pleadings and filings in this litigation) which it purports shows that Uber "highlight[ed] lack of clarity and safety concerns" to Seattle. OB-46 (citing 2-ER-186). The citation leads to a letter written by Uber to Seattle providing feedback on the draft Ordinance. 2-ER-186. There is only one mention of uncertainty, **and it concerns a different provision of the Ordinance** – not the policy provision Instacart claims

---

[45] https://www.instacart.com/help/section/4524023334676/360048057272.

is vague. *Id.* ("provision 8.40.080D" left "the ability of platform companies to redact and anonymize private information still uncertain"). Instacart identifies nowhere where it (or any company) raised vagueness concerns as to the provision Instacart challenges here. And, in this litigation, Instacart neither identified *any* proposed policy it would introduce but for the purportedly "vague" mandate nor hinted at what expression would be "chilled." Instacart "understand[s] [its] obligations," OB-45, it merely wishes to enact policies it well understands are prohibited by the Ordinance. *See, e.g.*, 1-ER-106.

Instacart failed to identify any "deterrent effect" of purported vagueness in the Ordinance, let alone a "real and substantial" deterrent effect on "legitimate expression[.]" *Tucson*, 91 F.4th at 1329-30.

**D.    Instacart is not likely to suffer irreparable harm.**

"[T]he mere assertion of First Amendment rights does not automatically require a finding of irreparable injury. It is the purposeful unconstitutional suppression of speech that constitutes irreparable harm for preliminary injunction purposes." *CTIA*, 928 F.3d at 851 (cleaned up). Instacart fails to establish this requirement.

Instacart obliquely acknowledged in its declaration to the district court – before the Ordinance went into effect – that the Ordinance would require it to adopt a compliant deactivation policy. 1-ER-106. It argues now, based solely on

this December 2024 statement, that it "was forced to publish a compliant deactivation policy."  OB-54 (citing 1-ER-106).  Not only does this one record citation *not* demonstrate that Instacart made any change to its deactivation policies, but its website today confirms that it has not done so.  *See supra* §V(D).  And, according to Instacart, its December 2024 policies, still in effect today, reflect "Instacart's stated position and views about safety and efficiency[.]"  1-ER-106.

Typically, with First Amendment claims, the plaintiff argues irreparable harm based on the "'hold your tongue and challenge now'" approach.  *Tingley*, 47 F.4th at 1067 (citation omitted).  The constitutional injury is the "'chilling of the exercise of First Amendment rights[.]'"  *Id.* (citation omitted).  But Instacart has *not* held its tongue, and the Ordinance has *not* chilled Instacart's exercise of its claimed First Amendment right to keep its policy in place.

Finally, Instacart's delay in joining what already was a last-minute lawsuit by Uber undercuts Instacart's claimed threat of irreparable harm.  As the district court noted, "it's really hard for me to buy that you couldn't have filed this ten days earlier," SER 123, or *16 months earlier*.  *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (a lengthy delay before seeking injunctive relief implies a lack of urgency and irreparable harm).

"The basis of injunctive relief in the federal courts is irreparable harm and inadequacy of legal remedies."  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l*

*Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).  "[M]onetary injury is not normally considered irreparable."  *Id*.  Instacart stood firm and avoided any chilling of its asserted rights by disregarding the Ordinance.  Its case is about damages if it can prevail on the merits below.

Instacart has suffered no irreparable harm.

### E.    The equities do not favor Instacart, and an injunction would not be in the public interest.

In assessing these final factors of the preliminary injunction standard, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  These factors favor Seattle.  It has a substantial interest in protecting workers who are at the mercy of Instacart's deactivation without warning, explanation, or reasonable basis.  Today, workers may enforce their rights under the Ordinance against Instacart.  SMC 8.40.230.

### F.    The Ordinance is severable.

Although Instacart condemns only the Policy Provision, it asserts that the entire Ordinance is unconstitutional.  Instacart's argument fails because the Ordinance is severable.  The many unchallenged sections promote Seattle's goal of ensuring fair processes to protect workers, whatever the content of deactivation policies.  The Ordinance can function because for "[m]ost of Instacart's history," – including today – "deactivation has been a matter of platform policy," OB-10, and

-69-

Instacart's policy is "embedded" in the right to contest deactivations and other unchallenged provisions.  OB-52.  Take away the Policy Provision, and the contest rights and other remaining provisions apply fully to nonmandated Instacart deactivation policies.

Severability of a local ordinance is a question of state law.  Washington courts consider "whether the constitutional and unconstitutional provisions are so connected … that it could not be believed that the legislature would have passed one without the other; or where the part eliminated is so intimately connected with the balance of the act as to make it useless to accomplish the purposes of the legislature."  *State v. Abrams*, 178 P.3d 1021, 1025 (Wash. 2008) (quotations omitted).

First, a severability clause "provide[s] the necessary assurance that the Legislature would have enacted the appropriate sections of the legislation despite the unconstitutional sections."  *El Centro De La Raza v. State*, 428 P.3d 1143, 1157 (Wash. 2018) (quotations omitted).  As Instacart explains, severability "is ordinarily a question of legislative intent: if the legislature wanted the law to stand without an invalid provision, a court would normally give effect to that desire."  OB-51.  That is precisely the case here.  The Ordinance contains a severability clause.  SMC 8.40.250.

Second, the Policy Provision is not "so intertwined with the remainder of the [Ordinance] and so fundamental to the [Ordinance's] efficacy" as to render the entire thing "invalid." *League of Women Voters of Wash. v. State*, 355 P.3d 1131, 1140 (Wash. 2015). The Ordinance also establishes a right for workers to challenge their deactivation through a procedure established by the company, SMC 8.40.060(B)(1), and requires companies to conduct fair and objective investigations before a deactivation. SMC 8.40.050(A)(3). It prohibits deactivations that are discriminatory, SMC 8.40.050(B), inconsistently applied, SMC 8.40.050(A)(5), disproportional to the offense, SMC 8.40.050(A)(6), or in retaliation against workers who exercise their rights. SMC 8.40.120. It establishes a private right of action for those injured by a violation. SMC 8.40.230. It also grants OLS rulemaking authority, enforcement power, and investigation power; establishes a navigation program and administrative appeal procedure. SMC 8.40.125-.167, .180-.220. Contrary to Instacart's claim that "[t]he policy requirements are embedded in every part of the Ordinance," OB-52, ***none of these provisions mention the policy requirement.*** The Ordinance also provides remedies for violations of provisions ***other than the policy requirement***. SMC 8.40.170.

Instacart does not challenge any of these provisions, and none depends on the Policy Provision. They remain useful in protecting workers, regardless of what

-71-

Instacart's policy must say or says, and are intended to remain in place. Notably, they all protect workers today from Instacart's application and violation of its own preferred policy described on its website.

Instacart's authority on this issue is inapposite. *League of Women Voters* concerned legislation in which the ***funding mechanism*** was deemed unconstitutional. The funding mechanism "represents the heart and soul" of a legislative enactment, which is rendered "virtually worthless without it." *League of Women Voters*, 355 P.3d at 412. Here, even without the Policy Provision, the Ordinance as a whole "has not been rendered 'useless,' as required by the test for severability." *Gerberding v. Munro*, 949 P.2d 1366, 1371 (Wash. 1998).

If any provision is deemed unconstitutional, that provision should be severed.

## IX.   CONCLUSION

Seattle respectfully requests affirmance of the denial of preliminary injunctive relief.

DATED this 11th day of March, 2025.

Respectfully submitted,

SUMMIT LAW GROUP, PLLC

By *s/ Jessica L. Goldman*
    Jessica L. Goldman, WSBA #21856
    *jessicag@summitlaw.com*
    Lawrence C. Locker, WSBA #15819
    *larryl@summitlaw.com*
    Jesse L. Taylor, WSBA #51603
    *jesset@summitlaw.com*
    Eva S. Oliver, WSBA #57019
    *evao@summitlaw.com*


ANN DAVISON
SEATTLE CITY ATTORNEY

By *s/ Ghazal Sharifi*
    Ghazal Sharifi, WSBA #47750
    *Ghazal.Sharifi@seattle.gov*

**Attorneys for the City of Seattle**

## STATEMENT OF RELATED CASES

In accordance with Circuit Rule 28-2.6, City of Seattle identifies the following related cases:

- *Uber Techs., Inc. et al. v. City of Seattle*, Case No. 25-228.  This case is an appeal arising from the same order denying a request for a preliminary injunction.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-231

I am the attorney or self-represented party.

**This brief contains** 15,400 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☑ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [               ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jessica L. Goldman **Date** March 11, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing

ANSWERING BRIEF OF APPELLEE CITY OF SEATTLE on this date with the

Clerk of the Court for the United States Court of Appeals for the Ninth Circuit

using the Appellate Electronic Filing System, which will serve the foregoing on all

registered case participants via the Appellate Electronic Filing system:

DATED this 11th day of March, 2025.

SUMMIT LAW GROUP, PLLC

By *s/ Jessica L. Goldman*
    Jessica L. Goldman, WSBA #21856
    *jessicag@summitlaw.com*
    Lawrence C. Locker, WSBA #15819
    *larryl@summitlaw.com*
    Jesse L. Taylor, WSBA #51603
    *jesset@summitlaw.com*
    Eva S. Oliver, WSBA #57019
    *evao@summitlaw.com*

ANN DAVISON
SEATTLE CITY ATTORNEY

By *s/ Ghazal Sharifi*
    Ghazal Sharifi, WSBA #47750
    *Ghazal.Sharifi@seattle.gov*

*Attorneys for the City of Seattle*

# ADDENDUM

## TABLE OF CONTENTS

ORDINANCE 126367 ................................................................. A-3 – A-7

ORDINANCE 126878 ............................................................. A-8 – A-59

SMC 8.37.070 ...................................................... A-60 – A-64

SMC 8.37.080 ...................................................... A-65 - A-66

SMC 8.37.100 ...................................................... A-67 – A-68

SMC 8.39.100 ...................................................... A-69 - A-71

Yolanda Ho
LEG Food Delivery Service Agreement ORD
D1k

# CITY OF SEATTLE

## ORDINANCE  126367

COUNCIL BILL  120092

AN ORDINANCE relating to the regulation of food delivery businesses and platforms; adding a new Chapter 7.30 to the Seattle Municipal Code.

WHEREAS, on February 29, 2020, the Washington Governor issued Proclamation 20-05, proclaiming a state of emergency for all counties throughout the state of Washington in response to new cases of the novel coronavirus (COVID-19); and

WHEREAS, on March 11, 2020, the World Health Organization announced that COVID-19 is officially a global pandemic; and

WHEREAS, on March 13, 2020, the President of the United States declared a national state of emergency in response to the COVID-19 pandemic; and

WHEREAS, on March 25, 2020, the Washington Governor issued Proclamation 20-25, prohibiting all people in Washington State from leaving their homes and all non-essential businesses in Washington State from conducting business ("Stay Home – Stay Healthy Proclamation"); and

WHEREAS, these actions are appropriate for public health reasons but result in severe economic impacts on businesses, families, and individuals in Seattle; and

WHEREAS, while restaurants are deemed an essential business, to reduce the spread of COVID-19 and protect public health, the Washington Governor has either restricted or prohibited indoor dining, causing Seattle restaurants to primarily rely on outdoor dining, pick-up orders, and delivery to serve consumers; and

Yolanda Ho
LEG Food Delivery Service Agreement ORD
D1k

1    WHEREAS, the 2016 Annual Survey of Entrepreneurs estimates that nearly 48 percent of the

2           owners of firms in the accommodation and food services industry in the Seattle

3           metropolitan area identify as Black, Indigenous, and People of Color; and

4    WHEREAS, a survey conducted in November 2020 by the National Restaurant Association of

5           6,000 restaurant operators found that 79 percent reported lower sales in October 2020 as

6           compared to October 2019, with an average 29 percent decrease in sales, and that 49

7           percent anticipate their staffing levels to decline during the next three months; and

8    WHEREAS, many consumers have been eager to support local restaurants during the pandemic,

9           resulting in sharply increased usage of third-party, app-based delivery platforms

10          ("platforms") to place orders with those restaurants; and

11    WHEREAS, on April 27, 2020, the City Council ("Council") adopted a modified civil

12          emergency order issued by the Mayor on April 24, 2020, that made it unlawful for these

13          platforms to charge restaurants a commission fee per online delivery or pick-up order that

14          exceeds 15 percent of the purchase price of such online order; and

15    WHEREAS, a restaurant may be listed on these platforms without the restaurant's explicit

16          permission, which can result in issues that negatively impact the consumer's experience

17          and the restaurant's reputation and income; and

18    WHEREAS, use of these platforms by consumers is predicted to continue growing at a steady

19          rate after the pandemic ends; and

20    WHEREAS, it is in the public interest that these platforms be required to attain the permission of

21          a restaurant before it can be listed; NOW, THEREFORE,

22    **BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

23          Section 1. A new Chapter 7.30 is added to the Seattle Municipal Code as follows:

Yolanda Ho
LEG Food Delivery Service Agreement ORD
D1k

1    **CHAPTER 7.30 FOOD DELIVERY PLATFORMS**

2    **7.30.010 Scope and purpose**

3    This Chapter 7.30 applies to all food delivery platforms operating within Seattle. The purpose of

4    this Chapter 7.30 is to require that food delivery platforms establish an agreement with

5    restaurants prior to offering pick-up or delivery from such restaurants on the food delivery

6    platform and delivering orders from such restaurants to consumers, with the goal of protecting

7    the interests of the City's consumers and restaurants.

8    **7.30.020 Definitions**

9        "Agreement" means a written contract between a restaurant and a food delivery platform.

10        "Consumer" means any person or persons purchasing a food order from a restaurant

11    using a food delivery platform.

12        "Director" means the Director of Finance and Administrative Services.

13        "Food delivery platform" means a person, other than a restaurant, that provides a means

14    through which a consumer may submit a food and/or beverage order to a restaurant, and arranges

15    for the order to be either picked up from the restaurant by the consumer or delivered from the

16    restaurant to the consumer.

17        "Person" means any individual, firm, corporation, association, partnership, governmental

18    entity, or their agents.

19        "Restaurant" means a business in which food and/or beverage preparation and service is

20    provided for individual consumption either on- or off-premise, and in which any service of

21    alcoholic beverages is accessory to the service of food.

22    **7.30.030 Agreement required**

Yolanda Ho
LEG Food Delivery Service Agreement ORD
D1k

1    A. A food delivery platform shall not offer pick-up or delivery services from a restaurant

2    without first obtaining an agreement with the restaurant expressly authorizing the food delivery

3    platform to take orders and offer delivery or pick-up of the food and/or beverages prepared by

4    the restaurant.

5    B. The agreement shall be terminated upon the restaurant's written request to the food

6    delivery platform. The food delivery platform shall remove the restaurant from its list of

7    participating restaurants within 72 hours of receiving the request for termination.

8    **7.30.040 Remedies**

9    A. Violations of this Chapter 7.30 shall be a Class 1 civil infraction under chapter 7.80

10   RCW, for which the maximum penalty is $250 plus statutory assessments. The civil infraction

11   shall be processed under chapter 7.80 RCW and notices of infraction for such violations may be

12   issued by the Director or the Director's designees. Each day of noncompliance shall be a separate

13   violation of this Chapter 7.30.

14   B. Any person or class of persons that suffers injury as a result of a violation of this

15   Chapter 7.30 may bring a civil action in a court of competent jurisdiction against the person

16   violating this Chapter 7.30 and, upon prevailing, may be awarded reasonable attorney fees and

17   costs and such legal or equitable relief as may be appropriate to remedy the violation.

18   C. An account shall be established in the City's General Fund to receive revenue from

19   penalties under this Section 7.30.040. Revenue from penalties under subsection 7.30.040.A shall

20   be used to support restaurants with five or fewer employees operating in Seattle. The Director of

21   the Office of Economic Development shall recommend to the Mayor and City Council how these

22   funds should be allocated.

Yolanda Ho
LEG Food Delivery Service Agreement ORD
D1k

1        Section 2. This ordinance shall take effect and be in force on September 15, 2021.

2        Passed by the City Council the ___14th___ day of _____June_____, 2021,

3   and signed by me in open session in authentication of its passage this __14th__day of

4   _____June_____, 2021.

5                                        _____

6                                        President _____ of the City Council

7   ☑ Approved /☐  returned unsigned / ☐ vetoed this __18th__ day of _____June_____, 2021.

8                                        _____

9                                        Jenny A. Durkan, Mayor

10       Filed by me this __18th__ day of _____June_____, 2021.

11                                       _____

12                                       Monica Martinez Simmons, City Clerk

13  (Seal)

*Template last revised December 1, 2020*                    5

A-7

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

**CITY OF SEATTLE**

**ORDINANCE** 126878

COUNCIL BILL 120580

AN ORDINANCE relating to app-based worker labor standards; establishing labor standards on
deactivation protections for app-based workers working in Seattle; amending Section
3.02.125 of the Seattle Municipal Code; and adding a new Chapter 8.40 to the Seattle
Municipal Code.

WHEREAS, the Washington Constitution provides in Article XI, Section 11 that "[a]ny county,

city, town or township may make and enforce within its limits all such local police,

sanitary and other regulations as are not in conflict with general laws";

NOW, THEREFORE,

**BE IT ORDAINED BY THE CITY OF SEATTLE AS FOLLOWS:**

Section 1. The City Council ("Council") finds and declares that:

A. App-based work is a growing source of income for workers in Seattle and across the

country.

B. In the exercise of The City of Seattle's police powers, the City is granted authority to

pass regulations designed to protect and promote public health, safety, and welfare.

C. This ordinance protects and promotes public health, safety, and welfare by

establishing protections against unwarranted deactivations for app-based workers.

D. Many Seattle workers, including app-based workers, cannot fully participate in the

community's dynamic civic life or pursue its myriad educational, cultural, and recreational

opportunities because they struggle to meet their households' most basic needs, suffering job

insecurity and economic instability.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    E. Minimum labor standards benefit employers and hiring entities by improving worker

2   performance, reducing worker turnover, and thereby improving productivity and the quality of

3   the services provided by workers, including app-based workers.

4    F. Network companies typically manage large pools of app-based workers by relying on

5   algorithmic management systems, which allow app-based workers to be "assigned, optimized,

6   and evaluated through algorithms and tracked data."[1]

7    G. While algorithmic management may bring certain benefits to network companies,

8   these innovations also generate significant challenges for app-based workers, including

9   information asymmetries and extreme power imbalances between workers and network

10  companies.[2]

11   H. App-based workers often do not have the information they need to know about how

12  they will be evaluated. Algorithms that dictate core aspects of app-based workers' relationship

13  with a network company can change unexpectedly, leading to arbitrary evaluations and

14  unwarranted deactivations.[3]

15   I. App-based workers are subject to network company policies that unilaterally deactivate

16  workers for a variety of reasons without consistent access to a fair process for such deactivations,

17  nor do the workers have access to responsive network company personnel with the power to

18  correct unwarranted deactivations by in-person meetings or telephone.

---

[1] Lee, Min Kyung, Kusbit, Daniel; Metsky, Evan; and Dabbish, Laura. "Working with Machines: The Impact of Algorithmic and Data-Driven Management on Human Workers." *Proceedings of the 33rd Annual ACM Conference on Human Factors in Computing Systems*, April 18, 2015, pp. 1603-1612, https://doi.org/10.1145/2702123.2702548.
[2] Mateescu, Alexandra, and Nguyen, Aiha. "Explainer: Algorithmic Management in the Workplace." *Data & Society*, February 2019, https://datasociety.net/wp-content/uploads/2019/02/DS_Algorithmic_Management_Explainer.pdf.
[3] FTC Policy Statement on Enforcement Related to Gig Work, September 2022, https://www.ftc.gov/system/files/ftc_gov/pdf/Matter%20No.%20P227600%20Gig%20Policy%20Statement.pdf.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    J. App-based workers face potential deactivation for reasons including but not limited to:

2    rejecting too many orders; being unavailable on certain days or times; cancelling offers with

3    cause; being delayed in fulfilling orders; receiving low ratings from consumers; or algorithmic

4    errors.

5    K. Network companies do not consistently apply clear performance expectations or

6    policies for deactivations, and often deactivate app-based workers without explanation or

7    warning.[4]

8    L. App-based workers report being deactivated for low customer ratings, despite the fact

9    that extensive social science research finds that consumer-sourced rating systems are highly

10   likely to be influenced by bias on the basis of factors such as race or ethnicity. App-based

11   workers also report deactivation based on customer harassment and false reports from

12   customers.[5]

13   M. Many network companies do not have processes to substantively reconsider a

14   deactivation based on a case-by-case human review, and have little incentive to put those

15   processes in place.[6]

16   N. A review of network company hiring policies shows that most network companies

17   perform recurring background checks on app-based workers as a condition of continued service.

---

[4] Figueroa, Maria, Guallpa, Ligia; Wolf, Andrew; Tsitouras, Glendy; and Hernàndez; Hildalyn Colón. *Essential but Unprotected: App-based Food Couriers in New York City*, 2021, pp. 31-32, *available at:* https://search.issuelab.org/resource/essential-but-unprotected-app-basedfood-couriers-in-new-york-city.html.
[5] National Employment Law Project, *App-Based Workers Speak: Studies Reveal Anxiety, Frustration, and a Desire for Good Jobs,* October 2021, p. 12, and footnote 23 on p. 18, https://s27147.pcdn.co/wp-content/uploads/App-Based-Workers-Speak-Oct-2021-1.pdf. See also Figueroa et al., *Essential but Unprotected: App-based Food Couriers in New York City*, pp. 31-32.
[6] See, e.g., Soper, Spencer. "Fired by Bot at Amazon: 'It's You Against the Machine'." *Bloomberg*, June 28, 2021. https://www.bloomberg.com/news/features/2021-06-28/fired-by-bot-amazon-turns-to-machine-managers-and-workers-are-losing-out. See also O'Brien, Sara Ashley. "Instacart shoppers demand answers over alleged wrongfully deactivated accounts." *CNN Business*, April 30, 2021. https://www.cnn.com/2021/04/30/tech/instacart-deactivations/index.html.

---

*Template last revised December 2, 2021*                    3

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1  Network companies do not provide clear guidance on background check criteria, methods for

2  evaluating the relationship of criminal history record information to the performance of app-

3  based service, procedures for correcting background check information, or procedures for

4  appealing deactivations based on background check information.

5       O. Unclear and/or inconsistently applied background check policies exacerbate the

6  difficulties app-based workers with criminal history records face when trying to secure or

7  maintain work opportunities.

8       P. The high prevalence of background checks with errors, mismatched identities, and

9  incomplete information, due to scant oversight of background check information provided to the

10  private market, compounds these difficulties.[7]

11       Q. Studies estimate that 50 to 80 percent of FBI criminal records are inaccurate. A

12  common problem is that law enforcement agencies fail to update arrest or charge records with

13  information about the outcome of a case. About a third of felony arrests never lead to a

14  conviction, another third lead to conviction of a different (usually lesser) offense, and other

15  convictions are overturned on appeal, expunged, or sealed.[8]

16       R. The flexibility to determine hours of availability and which offers to accept, reject, or

17  cancel with cause allows workers to make informed decisions on how and when to earn their

18  income without fear of deactivation.

---

[7] Lageson, Sarah Esther. "How Criminal Background Checks Lead to Discrimination Against Millions of Americans." *The Washington Post*, July 10, 2020, https://www.washingtonpost.com/opinions/2020/07/10/personal-data-industry-is-complicit-bad-policing-it-must-be-held-accountable.
[8] Wells, Martin; Cornwell, Erin York; Barrington, Linda; Bigler, Esta; Enayati, Hassan; and Vilhuber, Lars. "Criminal Record Inaccuracies and the Impact of a Record Education Intervention on Employment-Related Outcomes." *U.S. Department of Labor*, January 2, 2020, https://www.dol.gov/sites/dolgov/files/OASP/evaluation/pdf/LRE_WellsFinalProjectReport_December2020.pdf.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    S. App-based workers who perform services in Seattle are not typically limited to work in

2    the geographic boundaries of Seattle, and often accept offers to perform services in other

3    jurisdictions.

4    T. Access to the records substantiating a network company's decision to deactivate an

5    app-based worker, and access to records of the services performed in Seattle by that app-based

6    worker, are critical for an app-based worker to meaningfully challenge their deactivation and

7    attempt to get reinstated as soon as possible.

8    U. Establishing a reasonable standard for the deactivations of app-based workers as well

9    as the ability to challenge unwarranted deactivations will help ensure that thousands of app-

10   based workers who provide vital services in Seattle will be able to enjoy a measure of job

11   security.

12   V. App-based workers who have protection against unwarranted deactivation will be

13   more likely to remain in their positions over time. Such experienced app-based workers will

14   improve the safety and reliability of the app-based services provided to Seattle customers.

15   W. Minimum labor and compensation standards, including the right to challenge

16   unwarranted deactivations, promote the general welfare, health, and prosperity of Seattle by

17   ensuring that app-based workers have stable incomes and can better support and care for their

18   families and fully participate in Seattle's civic, cultural, and economic life.

19   X. The regulation of app-based workers better ensures that such workers can perform

20   their services in a safe and reliable manner and thereby promotes the welfare of the people and is

21   thus a fundamental governmental function.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1   Section 2. A new Chapter 8.40 is added to the Seattle Municipal Code as follows:

2 **Chapter 8.40 APP-BASED WORKER DEACTIVATION RIGHTS**

3 **8.40.010 Short title**

4 This Chapter 8.40 shall constitute the "App-Based Worker Deactivation Rights Ordinance" and

5 may be cited as such.

6 **8.40.020 Definitions**

7 For purposes of this Chapter 8.40:

8   "Accept" means an initial communication from an app-based worker to a network

9 company that the app-based worker intends to perform services in furtherance of an offer,

10 including but not limited to indicating acceptance through the worker platform.

11   "Adverse action" means reducing compensation; garnishing tips or gratuities; temporarily

12 or permanently denying or limiting access to work, incentives, or bonuses; offering less desirable

13 work; terminating; deactivating; threatening; penalizing; retaliating; engaging in unfair

14 immigration-related practices; filing a false report with a government agency; or discriminating

15 against any person for any reason prohibited by Section 8.40.120. "Adverse action" for an app-

16 based worker may involve any aspect of the app-based worker's work, including compensation,

17 work hours, volume, and frequency of offers made available, desirability and compensation rates

18 of offers made available, responsibilities, or other material change in the terms and conditions of

19 work or in the ability of an app-based worker to perform work. "Adverse action" also includes

20 any action by the network company or a person acting on the network company's behalf that

21 would dissuade a reasonable person from exercising any right afforded by this Chapter 8.40.

22   "Agency" means the Office of Labor Standards and any division therein.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1   "Aggrieved party" means an app-based worker or other person who suffers tangible or

2   intangible harm due to a network company's or other person's violation of this Chapter 8.40.

3   "App-based service" means any service in an offer facilitated or presented to an app-

4   based worker by a network company or participation by an app-based worker in any training

5   program required by a network company.

6   "App-based worker" means a person who has entered into an agreement with a network

7   company governing the terms and conditions of use of the network company's worker platform

8   or a person affiliated with and accepting offers to perform services for compensation via a

9   network company's worker platform. For purposes of this Chapter 8.40, at any time, but not

10  limited to, when an app-based worker is logged into the network company's worker platform, the

11  worker is considered an app-based worker.

12  "Application dispatch" means technology that allows customers to directly request

13  dispatch of app-based workers for provision of services and/or allows app-based workers or

14  network companies to accept offers to perform services for compensation and payments for

15  services via the internet using interfaces, including but not limited to website, smartphone, and

16  tablet applications.

17  "Background check" means a request or attempt to obtain, directly or through an agent,

18  a person's conviction record or criminal history record information from the Washington State

19  Patrol or any other source that compiles and maintains such records or information.

20  "Cancellation with cause" has the same meaning as defined in Section 8.37.020.

21  "City" means The City of Seattle.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    "Compensation" means the total amount of payment owed to an app-based worker by

2    reason of performing work facilitated or presented by the network company, including but not

3    limited to network company payments, bonuses, incentives, and tips earned from customers.

4    "Consumer report" has the same meaning as defined in RCW 19.182.010 as amended.

5    "Conviction record" and "criminal history record information" are meant to be

6    consistent with chapter 10.97 RCW as amended, and mean information regarding a final

7    criminal adjudication or other criminal disposition adverse to the subject, including a verdict of

8    guilty, a finding of guilty, or a plea of guilty or nolo contendere. A criminal conviction record

9    does not include any prior conviction that has been the subject of an expungement, vacation of

10    conviction, sealing of the court file, pardon, annulment, certificate of rehabilitation, or other

11    equivalent procedure based on a finding of the rehabilitation of the person convicted, or a prior

12    conviction that has been the subject of a pardon, annulment, or other equivalent procedure

13    based on a finding of innocence. It does include convictions for offenses for which the

14    defendant received a deferred or suspended sentence, unless the adverse disposition has been

15    vacated or expunged.

16    "Criminal history record information" is meant to be consistent with chapter 10.97 RCW

17    as amended.

18    "Customer" means a paying customer and/or recipient of an online order.

19    "Deactivation" means the blocking of an app-based worker's access to the worker

20    platform, changing an app-based worker's status from eligible to accept offers to perform

21    services to ineligible, or other material restriction in access to the worker platform that is effected

22    by a network company. Deactivation" does not include temporary suspensions lasting less than

23    48 hours when the worker platform is unavailable to an app-based worker due to reasons

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    unrelated to the action or behavior of the app-based worker and that are clearly communicated to

2    the app-based worker at the time of the temporary suspension. Such reasons include but are not

3    limited to: technology, software, or network outages; account access or security issues; routine

4    maintenance; and inclement weather endangering the safety of app-based workers in performing

5    services in Seattle.

6        "Director" means the Director of the Office of Labor Standards or the Director's

7    designee.

8        "Discrimination," "discriminate," and/or "discriminatory act" have the same meaning as

9    defined in Section 14.04.030.

10       "Driver record" means an abstract of a person's driving record as described in RCW

11   46.52.130 as amended.

12       "Egregious misconduct" means an action or behavior by an individual app-based worker

13   that: (1) endangers the physical safety of the customer, or a third person, the network company,

14   or an animal; or (2) intentionally causes economic harm to the customer, a third person, or the

15   network company; or (3) is threatening, harassing, or abusive to the customer, a third party, or

16   the network company. "Egregious misconduct" includes but is not limited to conduct that occurs

17   outside of an app-based worker's provision of app-based services or use of the network

18   company's worker platform if the network company can prove by a preponderance of the

19   evidence that the conduct directly relates to the app-based worker's fitness to provide app-based

20   services or to use the network company's worker platform.

21           1. "Egregious misconduct" includes but is not limited to the following conduct in

22   connection with an app-based worker's provision of app-based services or use of the network

23   company's worker platform: assault, sexual assault, sexual harassment, communicating with a

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1   minor for immoral purposes, sexual conduct as defined in RCW 7.105.010 as amended, unlawful

2   harassment as defined in RCW 7.105.010 as amended, hate crimes, racial slurs, unlawful

3   imprisonment as defined in RCW 9A.40.040 as amended, kidnapping, unlawful possession of a

4   firearm, solicitation of any sexual act, registration as a sex offender, stalking, theft, fraud,

5   robbery, burglary, money laundering, animal cruelty, cybercrimes as defined in chapter 9A.90

6   RCW as amended, prostitution, driving-related crimes pursuant to RCW 46.61.500 through

7   46.61.540 as amended, failing to maintain a valid state driver's license, and other conduct that

8   would constitute a Class A felony offense under Title 9 or 9A RCW as amended.

9           2. Egregious misconduct shall not include conduct related to non-criminal moving

10   violations as defined by WAC 308-104-160, as amended, or traffic collisions unless the app-

11   based worker has accumulated more than three non-criminal moving violations or at-fault

12   collisions in the previous three years.

13           3. The Director may issue rules further defining what constitutes economic harm

14   or egregious misconduct.

15       "Extraordinary circumstances" means circumstances beyond the network company's

16   control that will materially influence the determination of whether a deactivation was warranted.

17   Extraordinary circumstances may include, but are not limited to, a pending criminal

18   investigation.

19       "Franchise" has the same meaning as defined in RCW 19.100.010 as amended.

20       "Front pay" means the compensation an app-based worker would earn or would have

21   earned if reinstated to their former position.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

"Hearing Examiner" means the official appointed by the City Council and designated as the Hearing Examiner under Chapter 3.02 or that person's designee (e.g., Deputy Hearing Examiner or Hearing Examiner Pro Tem).

"Incentive" means a sum of money paid to an app-based worker in addition to the guaranteed minimum network company payment for an offer, upon completion of specific tasks presented by the network companies, including but not limited to completing performance of a certain number of offers, completing performance of a certain number of consecutive offers, completing performance of an offer subject to a price multiplier or variable pricing policy, making oneself available to accept offers in a particular geographic location during a specified period of time, or recruiting new app-based workers.

"Network company" means an organization, whether a corporation, partnership, sole proprietor, or other form, operating in Seattle, that uses an online-enabled application or platform, such as an application dispatch system, to connect customers with app-based workers, present offers to app-based workers through a worker platform, and/or facilitate the provision of services for compensation by app-based workers.

1. The term "network company" includes any such entity or person acting directly or indirectly in the interest of a network company in relation to the app-based worker.

2. The term "network company" excludes:

a. An entity offering services that enable individuals to schedule appointments with and/or process payments to users, when the entity neither engages in additional intermediation of the relationships between parties to such transactions nor engages in any oversight of service provision;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1      b. An entity operating digital advertising and/or messaging platforms,

2  when the entity neither engages in intermediation of the payments or relationships between

3  parties to resulting transactions nor engages in any oversight of service provision;

4      c. An entity that meets the definition of "transportation network company"

5  as defined by RCW 46.04.652 as amended; or

6      d. An entity that meets the definition of "for-hire vehicle company" or

7  "taxicab association" as defined in Section 6.310.110.

8      A company that meets the definition of network company in this Section 8.40.020 and

9  does not fall within any of the exclusions contained in this Section 8.40.020 is subject to this

10  Chapter 8.40. Network companies include marketplace network companies, as defined by

11  Section 8.37.020.

12      "Offer" means one or more online orders presented to an app-based worker as one

13  opportunity to perform services for compensation that the app-based worker may accept or

14  reject.

15      1. An opportunity to perform services for compensation includes but is not limited

16  to an opportunity described via a worker platform as a shift, a period of time to be spent engaged

17  in service provision, a continuous period of time in which the app-based worker must make

18  themself available to perform services, or any other continuous period of time when the worker

19  is not completely relieved of the duty to perform the service(s), and such a period of time shall

20  be considered as one offer.

21      2. The term "offer" includes pre-scheduled offers and on-demand offers, as

22  defined in Section 8.37.020.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1       "Online order" means an order for services that is placed through an online-enabled

2  application or platform, such as an application dispatch system, and that is facilitated by a

3  network company or presented by a network company for its own benefit. The Director may

4  issue rules further defining the definition of "online order" and the types of transactions excluded

5  from this definition. The term "online order" does not include the following transactions:

6       1. Sale or rental of products or real estate;

7       2. Payment in exchange for a service subject to professional licensure that has been listed

8  by the Director pursuant to Section 8.37.020;

9       3. Payment in exchange for services wholly provided digitally;

10       4. Payment in exchange for creative services or works;

11       5. Transportation network company (TNC) dispatched trips. For purposes of this Section

12  8.40.020, "TNC dispatched trips" means the provision of transportation by a driver for a

13  passenger through the use of a transportation network company's application dispatch system;

14  and

15       6. Transportation provided by taxicabs or for-hire vehicles, as defined in Chapter 6.310.

16       "Operating in Seattle" means, with respect to a network company, facilitating or

17  presenting offers to provide services for compensation using an online-enabled application or

18  platform, such as an application dispatch system, to any app-based worker, where such services

19  are performed in Seattle.

20       "Paying customer" means a person or entity placing an online order via a network

21  company's online-enabled application or platform.

22       "Perform services in Seattle" means activities, conducted by an app-based worker in

23  furtherance of an offer, that occur in whole or in part within Seattle.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1                1. The term "perform services in Seattle" includes any time spent on a

2    commercial stop in Seattle that is related to the provision of delivery or other services associated

3    with an offer.

4                2. The term "perform services in Seattle" does not include stopping for refueling,

5    stopping for a personal meal or errands, or time spent in Seattle solely for the purpose of

6    travelling through Seattle from a point of origin outside Seattle to a destination outside Seattle

7    with no commercial stops in Seattle.

8        "Rate of inflation" means 100 percent of the annual average growth rate of the bi-

9    monthly Seattle-Tacoma-Bellevue Area Consumer Price Index for Urban Wage Earners and

10    Clerical Workers, termed CPI-W, for the 12-month period ending in August; provided that the

11    percentage increase shall not be less than zero.

12        "Respondent" means the network company or any person who is alleged or found to have

13    committed a violation of this Chapter 8.40.

14        "Successor" means any person to whom a network company quitting, selling out,

15    exchanging, or disposing of a business sells or otherwise conveys in bulk and not in the ordinary

16    course of the network company's business, a major part of the property, whether real or personal,

17    tangible or intangible, of the network company's business. For purposes of this definition,

18    "person" means an individual, receiver, administrator, executor, assignee, trustee in bankruptcy,

19    trust, estate, firm, corporation, business trust, partnership, limited liability partnership, company,

20    joint stock company, limited liability company, association, joint venture, or any other legal or

21    commercial entity.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1       "Tips" means a verifiable sum to be presented by a customer as a gift or gratuity in

2    recognition of some service performed for the customer by the app-based worker receiving the

3    tip.

4       "Traffic infraction" means a violation of state law or administrative regulation, or local

5    law, ordinance, regulation, or resolution, relating to traffic including parking, standing, stopping,

6    and pedestrian offenses, which is not classified as a criminal offense, consistent with RCW

7    46.63.020 as amended. A "traffic infraction" includes any offense committed in another

8    jurisdiction that includes the elements of any offense designated as a traffic infraction consistent

9    with RCW 46.63.020 as amended.

10      "Unwarranted deactivation" means a deactivation that does not comply with Section

11    8.40.050.

12      "Worker platform" means the worker-facing application dispatch system software or any

13    online-enabled application service, website, or system, used by an app-based worker, that

14    enables the arrangement of services for compensation.

15      "Written" or "in writing" means a printed or printable communication in physical or

16    electronic format including a communication that is transmitted through email, text message, or a

17    computer system, or is otherwise sent or maintained electronically, including via the worker

18    platform.

19    **8.40.030 App-based worker coverage**

20      A. For the purpose of this Chapter 8.40, except for Section 8.40.100, covered app-based

21    workers are limited to those for whom:

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1. During the previous 180 days, at least 25 percent of their completed offers, or offers cancelled with cause, involved performing services in Seattle for a covered network company; or

2. The app-based worker's deactivation is related to an incident or incidents that occurred while performing services in Seattle for a covered network company.

B. For the purpose of Section 8.40.100, an app-based worker is covered by Section 8.40.100 if the app-based worker performs services in Seattle facilitated or presented by a network company covered by this Chapter 8.40.

C. An app-based worker who is a covered employee under Chapter 14.20 for a covered network company, or a covered employee under Chapter 14.20 for a customer of an online order, is not a covered app-based worker under this Chapter 8.40.

**8.40.040 Network company coverage**

A. For the purposes of this Chapter 8.40, covered network companies are limited to those that facilitate work performed by 250 or more app-based workers worldwide regardless of where those workers perform work, including but not limited to chains, integrated enterprises, or franchises associated with a franchise or network of franchises that facilitate work performed by 250 or more app-based workers worldwide in aggregate.

B. To determine the number of app-based workers performing work for the current calendar year:

1. The calculation is based upon the average number per calendar week of app-based workers who worked for compensation during the preceding calendar year for any and all weeks during which at least one app-based worker worked for compensation.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    2. For network companies that did not have any app-based workers during the

2    preceding calendar year, the number of app-based workers counted for the current calendar year

3    is calculated based upon the average number per calendar week of app-based workers who

4    worked for compensation during the first 90 calendar days of the current year in which the

5    network company engaged in business.

6    3. If a network company quits, sells out, exchanges, or disposes the network

7    company's business, or the network company's business is otherwise acquired by a successor,

8    the number of app-based workers hired for the current calendar year for the successor network

9    company is calculated based upon the average number per calendar week of app-based workers

10    who worked for compensation during the first 90 calendar days of the current year in which the

11    successor network company engaged in business.

12    4. All app-based workers who worked for compensation shall be counted,

13    including but not limited to:

14    a. App-based workers who are not covered by this Chapter 8.40;

15    b. App-based workers who worked in Seattle; and

16    c. App-based workers who worked outside Seattle.

17    C. Separate entities that form an integrated enterprise shall be considered a single

18    network company under this Chapter 8.40. Separate entities will be considered an integrated

19    enterprise and a single network company under this Chapter 8.40 where a separate entity controls

20    the operation of another entity. The factors to consider in making this assessment include but are

21    not limited to:

22    1. Degree of interrelation between the operations of multiple entities;

23    2. Degree to which the entities share common management;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1      3. Centralized control of labor relations;

2      4. Degree of common ownership or financial control over the entities; and

3      5. Use of a common brand, trade, business, or operating name.

4  **8.40.050 Deactivation requirements**

5      A. A network company shall adopt the following measures prior to deactivating an app-

6  based worker, except as provided in subsections 8.40.050.C and 8.40.050.D:

7      1. Fair notice of deactivation policy. A network company must inform the app-

8  based worker in writing of the network company's deactivation policy, defining what constitutes

9  a violation that may result in deactivation. The network company's written deactivation policy

10 must be specific enough for an app-based worker to understand what constitutes a violation and

11 how to avoid violating the policy. The deactivation policy must be available to the app-based

12 worker in English and any language that the network company knows or has reason to know is

13 the primary language of the app-based worker. The deactivation policy must be accessible to the

14 app-based worker at least three years after deactivation. The Director may issue rules governing

15 the form and description of the deactivation policy, the manner of its distribution, and required

16 languages for its translation.

17     2. Reasonable policy. The policy that may lead to a deactivation must be

18 reasonably related to the network company's safe and efficient operations. Examples of policies

19 that are not reasonably related to the network company's safe and efficient operations include,

20 but are not limited to:

21     a. Any rule or policy that would result in a deactivation based on an app-

22 based worker's availability to work or number of hours worked, consistent with subsection

23 8.37.080.A.1;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    b. Any policy that would result in a deactivation based on an app-based

2    worker's acceptance or rejection of any individual offer, any types of offers, or any number or

3    proportion of offers, consistent with subsection 8.37.080.A.2;

4    c. Any policy that would result in a deactivation based on an app-based

5    worker's cancellation of an offer with cause, consistent with subsection 8.37.080.C;

6    d. Any policy that would result in a deactivation based on an app-based

7    worker contacting the network company;

8    e. Any policy that would result in a deactivation based solely on a

9    quantitative metric derived from aggregate customer ratings of an app-based worker's

10    performance;

11    f. Any policy that would result in a deactivation based on statements by an

12    app-based worker regarding compensation and/or working conditions made to customers, other

13    app-based workers, network companies, the media, public officials, and/or the public;

14    g. Any policy that would result in a deactivation based on an app-based

15    worker asserting their legal rights, whether in court or via procedures provided by any local,

16    state, or federal agency; and

17    h. Any policy that would deactivate a worker based on the results of a

18    background check, consumer report, driver record, or record of traffic infractions, except in cases

19    of egregious misconduct or where required by other applicable law.

20    3. Investigation. A network company must conduct a fair and objective

21    investigation prior to deactivating an app-based worker. The investigation must be sufficiently

22    thorough to justify the deactivation and demonstrate an unbiased and neutral view of facts

23    collected. If the app-based worker does not participate in the investigation or provide relevant

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1  information, the network company may complete the investigation based on available sources of

2  information.

3         4. Confirmation of violation. The network company must demonstrate by a

4  preponderance of the evidence that the alleged violation of the network company's policy or rule

5  occurred.

6         5. Consistent application. The network company must apply the rule or policy,

7  and penalty for violations, in a consistent manner.

8         6. Proportionate penalty. The penalty of deactivation must be reasonably related

9  to the offense, and account for mitigating circumstances, such as the app-based worker's past

10 work history with the network company.

11     B. Deactivation of an app-based worker will be considered unwarranted if the action is

12 intended to or results in discrimination or a discriminatory act.

13     C. Subject to the provisions of this Section 8.40.050 and rules issued by the Director, a

14 network company may immediately deactivate an app-based worker if such action is required to

15 comply with any applicable court order or local, state, or federal laws or regulations, or where an

16 app-based worker has engaged in egregious misconduct.

17     D. In the case of allegations of egregious misconduct, the network company may

18 deactivate the app-based worker before completing an investigation. Except in extraordinary

19 circumstances, the investigation shall not take longer than 14 days. If the investigation is delayed

20 due to extraordinary circumstances, the network company must provide the app-based worker

21 with written notice that the investigation is delayed, the reason(s) for the delay, and the date on

22 which the completion of the investigation is anticipated.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1     **8.40.060 Right to challenge deactivation**

2         A. A network company shall not subject an app-based worker to unwarranted

3     deactivation.

4         B. An app-based worker shall have a right to challenge the worker's deactivation through

5     an internal deactivation challenge procedure established by the network company.

6             1. A network company shall create an internal deactivation challenge procedure

7     that shall be available to the app-based worker immediately upon notice of their deactivation and

8     up to 90 days after the app-based worker's receipt of notice.

9             2. The internal deactivation challenge procedure must be available to the app-

10    based worker in writing, in a format that is readily accessible to the app-based worker, and in

11    English and any language that the network company knows or has reason to know is the primary

12    language of the app-based worker. The written policy describing the deactivation challenge

13    procedure shall be available to the app-based worker at least three years after deactivation. The

14    Director may issue rules governing the form and content of the policy describing the deactivation

15    challenge procedure, the manner of its distribution, and required languages for its translation.

16            3. A network company shall review and respond to an app-based worker's

17    challenge to deactivation within 14 days of receiving a challenge.

18            4. A network company's response to a worker's challenge to deactivation must

19    include a written statement certified by an individual at the network company with authority to

20    reinstate the app-based worker. The written statement must include one of the following:

21                a. Evidentiary substantiation of the deactivation pursuant to Section

22    8.40.080, and substantive responses to questions or claims made by the app-based worker in

23    challenging the deactivation;

1             b. Any extraordinary circumstances necessitating a delayed timeline for

2  response, and an anticipated date for a response either substantiating the deactivation or

3  reinstating the app-based worker; or

4             c. A determination that the worker did not violate the network company's

5  deactivation policy and therefore must be reinstated on the platform.

6       C. In addition to pursuing an internal challenge to deactivation pursuant to subsection

7  8.40.060.B, an app-based worker shall have a right to file a complaint with the Agency or bring a

8  civil action for violations of the requirements of this Chapter 8.40 upon receiving the network

9  company's initial response to the internal challenge, or 14 days after initiating a challenge,

10  whichever comes earlier. An app-based worker may pursue all avenues of relief available

11  thereafter within three years of the alleged violation, or as tolled pursuant to subsection

12  8.40.150.C.

13       D. An app-based worker shall have a right to challenge their deactivation and pursue all

14  avenues of relief available to them regardless of the geographic location of the incidents leading

15  to the network company's decision to deactivate the app-based worker.

16  **8.40.070 Notice of deactivation**

17       A. Except as provided under subsection 8.40.070.C, a network company shall provide an

18  app-based worker with notice of deactivation 14 days in advance of the deactivation, as well as

19  upon the effective date of deactivation. The notice of deactivation shall include a written

20  statement of the following:

21            1. The reasons for deactivation; including the network company's policy that was

22  violated, pursuant to Section 8.40.050, and the specific incident or pattern of incidents that

23  violated the deactivation policy;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1        2. The effective date of deactivation;

2        3. Any and all records relied upon to substantiate deactivation, pursuant to Section

3    8.40.080;

4        4. The length of the deactivation;

5        5. A description of the steps an app-based worker can take to remedy the

6    deactivation;

7        6. The app-based worker's right to challenge such deactivation under this Chapter

8    8.40;

9        7. The network company's process for challenging a deactivation, pursuant to

10    subsection 8.40.060.B, including the available methods of contact for an app-based worker to

11    initiate a challenge; and

12        8. Any other items pursuant to Director's Rules.

13        B. The network company shall provide notice of deactivation in a form and manner

14    designated by the Agency. The Agency may create and distribute a model notice of deactivation

15    in English and other languages as provided by rules issued by the Director. However, network

16    companies are responsible for providing app-based workers with the notice of deactivation

17    required by this subsection 8.40.070, regardless of whether the Agency has created and

18    distributed a model notice of deactivation.

19        C. For deactivations involving egregious misconduct, pursuant to subsection 8.40.050.C,

20    the network company shall provide an app-based worker with the notice of deactivation no later

21    than the effective date of deactivation.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

**8.40.080 Access to records substantiating deactivation**

A. Pursuant to subsection 8.40.080.C, upon notice of deactivation, a network company shall provide an app-based worker with the records relied upon by the network company to substantiate deactivation, unless contrary to local, state, or federal law. These records shall include but not be limited to the date, time, and location of all incidents supporting the deactivation decision, a copy of the evidence the network company considered in the deactivation decision, and a certified statement from an individual at the network company with authority to reinstate the app-based worker, attesting that these are true and accurate records to the individual's knowledge.

B. If further records substantiating a deactivation come into the network company's possession after the app-based worker is deactivated, such records shall be provided to the app-based worker as soon as practicable and no later than 14 days from the date of the network company's receipt.

C. If an app-based worker challenges a deactivation pursuant to subsection 8.40.060.B, all records of that challenge and any responses must be provided to the worker within 14 days of each submittal or response.

D. If the records substantiating deactivation involve information related to a customer or a third party and the network company reasonably believes that information could compromise the customer or third party's safety, the network company may take measures to anonymize information related to that customer or third party. If a complaint from a customer or third party is the sole basis for a deactivation, the network company may provide a summary description of the records substantiating the deactivation. The Director may issue rules regarding the measures

1   taken to summarize the records substantiating the deactivation or anonymize information related

2   to a customer or third party.

3       E. Network companies covered by Chapter 8.37 shall establish an accessible system for

4   app-based workers to access their receipts for each offer performed or cancelled, pursuant to

5   subsection 8.37.070.B. Network companies shall make this system available to the app-based

6   worker via smartphone application or online web portal. This accessible system shall be

7   available to an app-based worker at least three years after deactivation.

8       F. Network companies shall retain the records required by this Section 8.40.080 for a

9   period of three years.

10      G. If a network company fails to disclose adequate records to the app-based worker as

11  required under this Section 8.40.080, there shall be a presumption, rebuttable by clear and

12  convincing evidence, that the network company violated this Chapter 8.40 for the relevant

13  periods and for each app-based worker for whom records were not disclosed in a timely manner.

14  This presumption is substantive and necessary to effectuate the other rights provided in this

15  Chapter 8.40.

16  **8.40.090 Affirmative production of records**

17      A. A network company shall affirmatively transmit to the Agency such records as

18  required by rules issued by the Director, on at least a quarterly basis until July 1, 2026, and at

19  least every six months thereafter. The Director shall have the authority to require such

20  aggregated or disaggregated records deemed necessary, appropriate, or convenient to administer,

21  evaluate, and enforce the provisions of this Chapter 8.40. The Director may issue rules requiring

22  that aggregated records be produced as a distribution at defined percentiles. The Director may

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1  issue data production rules of general applicability as well as rules specific to on-demand

2  network companies, as defined in Section 8.37.020.

3         1. Records for production may include:

4            a. Records regarding the number of deactivations initiated by a network

5  company;

6            b. Records regarding the reasons for deactivation most commonly referred

7  to, such as the rule or policy violated by the app-based worker;

8            c. The number of app-based workers challenging their deactivation and the

9  forum in which they are pursuing a challenge;

10            d. The number of app-based workers reinstated after deactivation, length

11  of deactivation prior to reinstatement, and length of service prior to deactivation;

12            e. The network company's deactivation policy;

13            f. The network company's internal deactivation challenge procedure,

14  pursuant to Section 8.40.060, including the available methods of contact for an app-based worker

15  to initiate a challenge; and

16            g. Any other records that the Director determines are material and

17  necessary to effectuate the purposes of this Chapter 8.40.

18         2. The Director shall issue rules governing the submission format, security, and

19  privacy protocols relating to the submission of network company records, to the extent permitted

20  by law.

21  **8.40.100 Notice of rights**

22      A. Network companies shall affirmatively provide each app-based worker with a written

23  notice of rights established by this Chapter 8.40. The Agency may create and distribute a model

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1  notice of rights in English and other languages. If the Agency creates a model notice of rights,

2  network companies shall affirmatively provide such notice according to the schedule outlined in

3  subsection 8.40.100.A.1. However, network companies are responsible for providing app-based

4  workers with the notice of rights required by this Section 8.40.100, in a form and manner

5  sufficient to inform app-based workers of their rights under this Chapter 8.40, regardless of

6  whether the Agency has created and distributed a model notice of rights.

7      1. Network companies shall affirmatively provide each app-based worker with the

8  written notice of rights within one month of the effective date of this Chapter 8.40. For each app-

9  based worker hired by the network company after this date, network companies shall provide the

10  notice of rights within 24 hours of the first completed offer that involved performing services in

11  Seattle, facilitated or presented by the network company.

12      2. For each app-based worker, network companies shall provide the notice of

13  rights no less than annually.

14    B. The notice of rights shall provide information on:

15      1. The right to challenge an unwarranted deactivation through a network

16  company's internal deactivation challenge procedure and/or through other avenues pursuant to

17  Section 8.40.060, subject to coverage eligibility under subsection 8.40.030.A;

18      2. The policy describing the deactivation challenge procedure pursuant to

19  subsection 8.40.060.B;

20      3. The right to 14 days' notice of an impending deactivation, except in the case of

21  egregious misconduct;

22      4. The right to access any and all records relied upon by the network company to

23  substantiate deactivation, pursuant to Section 8.40.080;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1      5. The right to be protected from retaliation for exercising in good faith the rights

2   protected by this Chapter 8.40; and

3      6. The right to file a complaint with the Agency consistent with Section 8.40.130

4   or bring a civil action for violation of the requirements of this Chapter 8.40.

5      C. Network companies shall provide the notice of rights required by subsection

6   8.40.100.B in an electronic format that is readily accessible to the app-based worker. The notice

7   of rights shall be made available to the app-based worker via smartphone application, email, or

8   online web portal, in English and any language that the network company knows or has reason to

9   know is the primary language of the app-based worker. The Director may issue rules governing

10  the form and content of the notice of rights, the manner of its distribution, and required

11  languages for its translation.

12      D. Network companies other than marketplace network companies shall establish an

13  accessible system for app-based workers to understand their eligibility to challenge a

14  deactivation, pursuant to subsection 8.40.030.A. This system shall be available to the app-based

15  worker via smartphone application or online web portal. This system shall be available to an app-

16  based worker, at least three years after deactivation. The Director may issue rules defining

17  reasonable criteria or requirements for this system to ensure that app-based workers have

18  sufficient information to understand when they are covered by the entirety of this Chapter 8.40,

19  including but not limited to notice of coverage by this Chapter 8.40, the number of offers

20  completed or cancellations in the previous 180 days, the number of completed offers or

21  cancellations that involved performing services in Seattle in the previous 180 days, the overall

22  percentage of completed offers that involved performing services in Seattle in the previous 180

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    days, and the app-based worker's receipts and/or payment disclosures for each offer performed

2    or cancelled in the previous 180 days, pursuant to subsection 8.37.070.B and Section 14.34.060.

3            E. Marketplace network companies shall provide sufficient information for app-based

4    workers to understand their eligibility to challenge a deactivation upon request by the app-based

5    worker. Marketplace network companies shall make this information available upon request to

6    the app-based worker via email. Marketplace network companies shall make this information

7    available to an app-based worker, at least three years after deactivation. The Director may issue

8    rules defining reasonable criteria or requirements to ensure that app-based workers have

9    sufficient information to understand when they are covered by the entirety of this Chapter 8.40,

10   including but not limited to notice of coverage by this Chapter 8.40, the number of offers

11   completed or cancellations in the previous 180 days, the number of completed offers or

12   cancellations that involved performing services in Seattle in the previous 180 days, and the

13   overall percentage of completed offers that involved performing services in Seattle in the

14   previous 180 days.

15   **8.40.110 Network company records**

16           A. Network companies shall retain records that document compliance with this Chapter

17   8.40 for each app-based worker, including, at a minimum, a compliance file for each

18   deactivation. The Director may issue rules governing the format of the records needed to

19   constitute compliance of this Section 8.40.110. The Director may also issue rules governing the

20   form, format, and content of the compliance file for each deactivation. This compliance file may

21   include:

22                   1. The deactivation notice provided to the app-based worker, pursuant to Section

23   8.40.070;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1        2. Date of completion of investigation;

2        3. Whether the deactivation involved egregious misconduct and, if so, the

3  egregious misconduct at issue;

4        4. Whether the deactivation investigation includes extraordinary circumstances,

5  pursuant to subsection 8.40.050.B and, if so, the extraordinary circumstances at issue;

6        5. Number of offers completed in the 180 days prior to deactivation notice;

7        6. Number of completed offers that involved performing services in Seattle in the

8  180 days prior to deactivation notice;

9        7. Date of deactivation challenge according to the network company's internal

10  deactivation challenge procedure;

11        8. All responses to an app-based worker regarding a deactivation challenge,

12  pursuant to subsections 8.40.060.B and 8.40.080.C; and

13        9. Any other records pursuant to Director's Rules.

14    B. Network companies shall retain the records required by subsection 8.40.110.A for a

15  period of three years.

16    C. If a network company fails to retain adequate records required under subsection

17  8.40.110.A, there shall be a presumption, rebuttable by clear and convincing evidence, that the

18  network company violated this Chapter 8.40 for the relevant periods and for each app-based

19  worker for whom records were not retained. This presumption is substantive and necessary to

20  effectuate the rights provided in this Chapter 8.40.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    **8.40.120 Retaliation prohibited**

2        A. No network company or any other person acting on behalf of the network company

3    shall interfere with, restrain, deny, or attempt to deny the exercise of any right protected under

4    this Chapter 8.40.

5        B. No network company or any other person shall take any adverse action against any

6    person because the person has exercised in good faith the rights protected under this Chapter

7    8.40. Such rights include, but are not limited to, the right to make inquiries about the rights

8    protected under this Chapter 8.40; the right to inform others about their rights under this Chapter

9    8.40; the right to inform the person's network company, the person's legal counsel, a union or

10   similar organization, or any other person about an alleged violation of this Chapter 8.40; the right

11   to file an oral or written complaint with the Agency or bring a civil action for an alleged

12   violation of this Chapter 8.40; the right to cooperate with the Agency in its investigations of this

13   Chapter 8.40; the right to testify in a proceeding under or related to this Chapter 8.40; the right to

14   refuse to participate in an activity that would result in a violation of city, state, or federal law;

15   and the right to oppose any policy, practice, or act that is unlawful under this Chapter 8.40.

16       C. No network company or any other person shall communicate to a person exercising

17   rights protected in this Section 8.40.120, directly or indirectly, the willingness to inform a

18   government worker that the person is not lawfully in the United States, or to report, or to make

19   an implied or express assertion of a willingness to report, suspected citizenship or immigration

20   status of an app-based worker or family member of an app-based worker to a federal, state, or

21   local agency because the app-based worker has exercised a right under this Chapter 8.40.

22       D. It shall be a rebuttable presumption of retaliation if a network company or any other

23   person takes an adverse action against a person within 90 days of the person's exercise of rights

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1  protected in this Section 8.40.120. The network company may rebut the presumption with clear

2  and convincing evidence that the adverse action was taken for a permissible purpose.

3      E. Proof of retaliation under this Section 8.40.120 shall be sufficient upon a showing that

4  a network company or any other person has taken an adverse action against a person and the

5  person's exercise of rights protected in this Section 8.40.120 was a motivating factor in the

6  adverse action, unless the network company can prove that the action would have been taken in

7  the absence of such protected activity.

8      F. The protections afforded under this Section 8.40.120 shall apply to any person who

9  mistakenly but in good faith alleges violations of this Chapter 8.40.

10     G. A complaint or other communication by any person triggers the protections of this

11 Section 8.40.120 regardless of whether the complaint or communication is in writing or makes

12 explicit reference to this Chapter 8.40.

13 **8.40.125 Rulemaking authority**

14 The Director is authorized to promulgate, revise, or rescind rules and regulations deemed

15 necessary, appropriate, or convenient to administer, evaluate, and enforce the provisions of this

16 Chapter 8.40 pursuant to Chapter 3.02, providing affected entities with due process of law and

17 in conformity with the intent and purpose of this Chapter 8.40. Any rules promulgated by the

18 Director shall have the force and effect of law and may be relied on by network companies, app-

19 based workers, and other parties to determine their rights and responsibilities under this Chapter

20 8.40.

21 **8.40.130 Enforcement power and duties**

22     A. Except as provided in subsection 8.40.130.B, on or after January 1, 2025, the Agency

23 shall have the power to administer and enforce this Chapter 8.40 and shall have such powers and

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    duties in the performance of these functions as are defined in this Chapter 8.40 and otherwise

2    necessary and proper in the performance of the same and provided for by law.

3          B. The Agency shall not have the power to enforce subsections 8.40.050.A.3,

4    8.40.050.A.4, 8.40.050.A.5, 8.40.050.A.6, 8.40.050.B, 8.40.050.C, and 8.40.060.A until June 1,

5    2027. Starting June 1, 2027, the Agency may enforce subsections 8.40.050.A.3, 8.40.050.A.4,

6    8.40.050.A.5, 8.40.050.A.6, 8.40.050.B, 8.40.050.C, and 8.40.060.A. This subsection 8.40.130.B

7    does not limit the ability of an app-based worker to seek other avenues of relief for violations of

8    those subsections.

9    **8.40.140 Violation**

10   The failure of any respondent to comply with any requirement imposed on the respondent under

11   this Chapter 8.40 is a violation.

12   **8.40.150 Investigation**

13          A. Except as provided in subsection 8.40.130.B, the Agency shall have the power to

14   investigate any violations of this Chapter 8.40 by any respondent. The Agency may prioritize

15   investigations of workforces that are vulnerable to violations of this Chapter 8.40. The Agency

16   may initiate an investigation pursuant to Director's Rules, including but not limited to situations

17   when the Director has reason to believe that a violation has occurred or will occur, or when

18   circumstances show that violations are likely to occur within a class of network companies or

19   businesses because either the workforce contains significant numbers of app-based workers who

20   are vulnerable to violations of this Chapter 8.40, or the workforce is unlikely to volunteer

21   information regarding such violations. An investigation may also be initiated through the receipt

22   by the Agency of a report or complaint filed by an app-based worker, or any other person.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

B. An app-based worker or other person may report to the Agency any suspected

violation of this Chapter 8.40. The Agency shall encourage reporting pursuant to this Section

8.40.150 by taking the following measures:

1. The Agency shall keep confidential, to the maximum extent permitted by

applicable laws, the name and other identifying information of the app-based worker or person

reporting the violation. However, with the authorization of such person, the Agency may disclose

the name of the app-based worker or other person and identifying information as necessary to

enforce this Chapter 8.40 or for other appropriate purposes.

2. The Agency may require the network company to post or otherwise notify other

app-based workers working for the network company that the Agency is conducting an

investigation. The network company shall provide the notice of investigation in a form, place,

and manner designated by the Agency. The Agency shall create the notice of investigation in

English and other languages.

3. The Agency may certify the eligibility of eligible persons for "U" Visas under

the provisions of 8 U.S.C. § 1184(p) and 8 U.S.C. § 1101(a)(15)(U). This certification is subject

to applicable federal law and regulations, and Director's Rules.

C. The Agency's investigation shall commence within three years of the alleged

violation. To the extent permitted by law, the applicable statute of limitations for civil actions is

tolled during any investigation under this Chapter 8.40 and any administrative enforcement

proceeding under this Chapter 8.40 based upon the same facts. For purposes of this Chapter 8.40:

1. The Agency's investigation begins on the earlier date of when the Agency

receives a complaint from a person under this Chapter 8.40, or when the Agency provides notice

to the respondent that an investigation has commenced under this Chapter 8.40.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1     2. The Agency's investigation ends when the Agency issues a final order

2    concluding the matter and any appeals have been exhausted; the time to file any appeal has

3    expired; or the Agency notifies the respondent in writing that the investigation has been

4    otherwise resolved.

5     D. The Agency's investigation shall be conducted in an objective and impartial manner.

6     E. The Director may apply by affidavit or declaration in the form allowed under RCW

7    5.50.050 as amended to the Hearing Examiner for the issuance of subpoenas requiring a network

8    company to produce the records required by Section 8.40.080 or 8.40.110, or for the attendance

9    and testimony of witnesses, or for the production of documents required to be retained under

10    Section 8.40.080 or 8.40.110, or any other document relevant to the issue of whether any app-

11    based worker or group of app-based workers received the information or other benefits required

12    by this Chapter 8.40, and/or to whether a network company has violated any provision of this

13    Chapter 8.40. The Hearing Examiner shall conduct the review without hearing as soon as

14    practicable and shall issue subpoenas upon a showing that there is reason to believe that: a

15    violation has occurred; a complaint has been filed with the Agency; or circumstances show that

16    violations are likely to occur within a class of businesses because the workforce contains

17    significant numbers of app-based workers who are vulnerable to violations of this Chapter 8.40,

18    the workforce is unlikely to volunteer information regarding such violations, or the Agency has

19    gathered preliminary information indicating that a violation may have occurred.

20     F. A network company that fails to comply with the terms of any subpoena issued under

21    subsection 8.40.150.E in an investigation by the Agency under this Chapter 8.40 before the

22    issuance of a Director's Order issued pursuant to subsection 8.40.160.C may not use such

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1     records in any appeal to challenge the correctness of any determination by the Agency of

2     liability, damages owed, or penalties assessed.

3        G. In addition to other remedies, the Director may refer any subpoena issued under

4     subsection 8.40.150.E to the City Attorney to seek a court order to enforce any subpoena.

5        H. Where the Director has reason to believe that a violation has occurred, the Director

6     may order any appropriate temporary or interim relief to mitigate the violation or maintain the

7     status quo pending completion of a full investigation or hearing, including but not limited to a

8     deposit of funds or bond sufficient to satisfy a good faith estimate of compensation, interest,

9     damages, and penalties due. A respondent may appeal any such order in accordance with Section

10     8.40.180.

11     **8.40.160 Findings of fact and determination**

12        A. Except when there is an agreed-upon settlement, the Director shall issue a written

13     determination with findings of fact resulting from the investigation and statement of whether a

14     violation of this Chapter 8.40 has or has not occurred based on a preponderance of the evidence

15     before the Director.

16        B. If the Director determines that there is no violation of this Chapter 8.40, the Director

17     shall issue a "Determination of No Violation" with notice of an app-based worker's or other

18     person's right to appeal the decision, pursuant to Director's Rules.

19        C. If the Director determines that a violation of this Chapter 8.40 has occurred, the

20     Director shall issue a "Director's Order" that shall include a notice of violation identifying the

21     violation or violations.

22          1. The Director's Order shall state with specificity the amounts due under this

23     Chapter 8.40 for each violation, including payment of unpaid compensation, liquidated damages,

1    civil penalties, penalties payable to aggrieved parties, fines, and interest pursuant to Section

2    8.40.170.

3        2. The Director's Order may specify that civil penalties and fines due to the

4    Agency can be mitigated for respondent's timely payment of remedy due to an aggrieved party

5    pursuant to subsection 8.40.170.A.4.

6        3. The Director's Order may specify that civil penalties and fines are due to the

7    aggrieved party rather than due to the Agency.

8        4. The Director's Order may direct the respondent to take such corrective action

9    as is necessary to comply with the requirements of this Chapter 8.40, including but not limited to

10    monitored compliance for a reasonable time period.

11        5. The Director's Order shall include notice of the respondent's right to appeal the

12    decision pursuant to Section 8.40.180.

13    **8.40.167 Navigation program**

14        A. The Agency may establish a navigation program that provides intake, information,

15    outreach, and/or education relating to the provisions and procedures of this Chapter 8.40. The

16    range of information provided by the navigation program may include, but is not limited to:

17        1. General court information, such as:

18          a. Information on court procedures for filing civil actions in a court of

19    competent jurisdiction; and

20          b. Information on obtaining translation and interpretation services;

21        2. General arbitration information, such as:

22          a. Information on arbitration procedures for filing arbitration claims; and

23          b. Information on obtaining translation and interpretation services;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1        3. A list of organizations that can be used to identify attorneys;

2        4. Organizations providing outreach and education, and/or legal assistance, to

3  app-based workers;

4        5. Information about classifying workers as employees or independent

5  contractors; and

6        6. As determined by the Director, additional information related to the provisions

7  of this Chapter 8.40, other workplace protections, or other resources for resolving workplace

8  issues.

9      B. The navigation program shall not include legal advice from the Agency. However, if

10  the Agency provides information to an app-based worker about a community organization

11  through the navigation program, the community organization is not precluded from providing

12  legal advice.

13  **8.40.170 Remedies**

14      A. The payment of unpaid compensation, liquidated damages of up to twice the amount

15  of unpaid compensation, civil penalties, penalties payable to aggrieved parties, fines, and interest

16  provided under this Chapter 8.40 is cumulative and is not intended to be exclusive of any other

17  available remedies, penalties, fines, and procedures.

18        1. The amounts of all civil penalties, penalties payable to aggrieved parties, and

19  fines contained in this Section 8.40.170 shall be increased annually to reflect the rate of inflation

20  and calculated to the nearest cent on January 1 of each year thereafter. The Agency shall

21  determine the amounts and file a schedule of such amounts with the City Clerk.

22        2. If a violation is ongoing when the Agency receives a complaint or opens an

23  investigation, the Director may order payment of unpaid compensation plus interest that accrues

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1   after receipt of the complaint or after the investigation opens and before the date of the Director's

2   Order.

3          3. Interest shall accrue from the date the unpaid compensation was first due at 12

4   percent annum, or the maximum rate permitted under RCW 19.52.020 as amended.

5          4. If there is a remedy due to an aggrieved party, the Director may waive part or

6   all civil penalties and fines due to the Agency based on timely payment of the full remedy due to

7   the aggrieved party.

8                 a. The Director may waive the total amount of civil penalties and fines due

9   to the Agency if the Director determines that the respondent paid the full remedy due to the

10  aggrieved party within ten days of service of the Director's Order.

11                b. The Director may waive half the amount of civil penalties and fines due

12  to the Agency if the Director determines that the respondent paid the full remedy due to the

13  aggrieved party within 15 days of service of the Director's Order.

14                c. The Director shall not waive any amount of civil penalties and fines due

15  to the Agency if the Director determines that the respondent has not paid the full remedy due to

16  the aggrieved party after 15 days of service of the Director's Order.

17          5. When determining the amount of liquidated damages, civil penalties, penalties

18  payable to aggrieved parties, and fines due under this Section 8.40.170 for a settlement

19  agreement or Director's Order, including but not limited to the mitigation of civil penalties and

20  fines due to the Agency for timely payment of remedy due to an aggrieved party under

21  subsection 8.40.170.A.4, the Director may consider:

22                a. The total amount of unpaid compensation, liquidated damages,

23  penalties, fines, and interest due;

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1          b. The nature and persistence of the violations;

2          c. The extent of the respondent's culpability;

3          d. The substantive or technical nature of the violations;

4          e. The size, revenue, and human resources capacity of the respondent;

5          f. The circumstances of each situation;

6          g. The amount of penalties in similar situations; and

7          h. Pursuant to rules that the Director may issue, other factors that are

8 material and necessary to effectuate the terms of this Chapter 8.40.

9     B. A respondent found to be in violation of this Chapter 8.40 shall be liable for full

10 payment of unpaid compensation due plus interest in favor of the aggrieved party for the period

11 of deactivation under the terms of this Chapter 8.40, and other equitable relief.

12          1. If the precise amount of unpaid compensation cannot be determined due to a

13 respondent's failure to produce records or if a respondent produces records in a manner or form

14 which makes timely determination of the amount of unpaid compensation impracticable, the

15 Director may:

16          a. Determine unpaid compensation as a matter of just and reasonable

17 inference, including the use of representative evidence such as testimony or other evidence from

18 representative employees or other aggrieved parties establishing violations for a class of

19 employees or aggrieved parties; or

20          b. Assess a daily amount for unpaid compensation plus interest in favor of

21 the aggrieved party in a minimum amount of at least the equivalent of payment for eight hours of

22 work at the "hourly minimum wage" rate for Schedule 1 employers under Chapter 14.19.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    2. For a first violation of this Chapter 8.40, the Director may assess liquidated

2 damages in an additional amount of up to twice the unpaid compensation.

3    3. For subsequent violations of this Chapter 8.40, the Director shall assess an

4 amount of liquidated damages in an additional amount of twice the unpaid compensation.

5    4. For purposes of establishing a first and subsequent violation for this Section

6 8.40.170, the violation must have occurred within ten years of the settlement agreement or

7 Director's Order.

8   C. A respondent found to be in violation of this Chapter 8.40 for retaliation under Section

9 8.40.120 shall be subject to any appropriate relief at law or equity including, but not limited to,

10 reinstatement of the aggrieved party, front pay in lieu of reinstatement with full payment of

11 unpaid compensation plus interest in favor of the aggrieved party under the terms of this Chapter

12 8.40, and liquidated damages in an additional amount of up to twice the unpaid compensation.

13 The Director also shall order the imposition of a penalty payable to the aggrieved party of up to

14 $6,230.88.

15   D. The Director is authorized to assess civil penalties for a violation of this Chapter 8.40

16 and may specify that civil penalties are due to the aggrieved party rather than due to the Agency.

17    1. For a first violation of this Chapter 8.40, the Director may assess a civil penalty

18 of up to $622.85 per aggrieved party.

19    2. For a second violation of this Chapter 8.40, the Director shall assess a civil

20 penalty of up to $1,245.71 per aggrieved party, or an amount equal to ten percent of the total

21 amount of unpaid compensation, whichever is greater.

3. For a third or any subsequent violation of this Chapter 8.40, the Director shall assess a civil penalty of up to $6,230.88 per aggrieved party, or an amount equal to ten percent of the total amount of unpaid compensation, whichever is greater.

4. For purposes of this subsection 8.40.170.D, a violation is a second, third, or subsequent violation if the respondent has been a party to one, two, or more than two settlement agreements, respectively, stipulating that a violation has occurred; and/or one, two, or more than two Director's Orders, respectively, have issued against the respondent in the ten years preceding the date of the violation; otherwise, it is a first violation.

E. The Director is authorized to assess fines for a violation of this Chapter 8.40 and may specify that fines are due to the aggrieved party rather than due to the Agency. The Director is authorized to assess fines as follows:

| Violation | Fine |
| --- | --- |
| Failure to comply with deactivation requirements under Section 8.40.050 | $622.85 per aggrieved party |
| Failure to provide app-based worker with an internal deactivation challenge procedure under Section 8.40.060 | $622.85 per aggrieved party |
| Failure to provide app-based worker with a notice of deactivation under Section 8.40.070 | $622.85 per aggrieved party |
| Failure to provide app-based worker with records relied upon by the network company to substantiate the deactivation under Section 8.40.080 | $622.85 per aggrieved party |
| Failure to provide certified statement attesting to records provided to substantiate deactivation under Section 8.40.080 | $622.85 per aggrieved party |
| Failure to provide written notice of rights under Section 8.40.100 | $622.85 per aggrieved party |
| Failure to retain network company records for three years under subsections 8.40.110.B | $622.85 per missing record |
| Failure to provide notice of investigation to app-based workers under subsection 8.40.150.B.2 | $622.85 per aggrieved party |
| Failure to post or distribute public notice of failure to comply with final order under subsection 8.40.210.A.1 | $622.85 per aggrieved party |

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    The maximum amount that may be imposed in fines in a one-year period for each type of

2    violation listed above is $6,230.88 per aggrieved party.

3          F. A respondent that willfully hinders, prevents, impedes, or interferes with the Director

4    or Hearing Examiner in the performance of their duties under this Chapter 8.40 shall be subject

5    to a civil penalty of not less than $1,245.71 and not more than $6,230.88.

6          G. In addition to the unpaid compensation, penalties, fines, liquidated damages, and

7    interest, the Agency may assess against the respondent in favor of the City the reasonable costs

8    incurred in enforcing this Chapter 8.40, including but not limited to reasonable investigation

9    costs and attorneys' fees. The Director may issue rules on the amounts and contributing factors

10    for assessing reasonable investigation costs and is strongly encouraged to assess such costs in

11    favor of the City to support the Agency's implementation of this Chapter 8.40.

12          H. A respondent that is the subject of a settlement agreement stipulating that a violation

13    shall count for debarment, or a final order for which all appeal rights have been exhausted, shall

14    not be permitted to bid, or have a bid considered, on any City contract until such amounts due

15    under the final order have been paid in full to the Director. If the respondent is the subject of a

16    final order two times or more within a five-year period, the network company shall not be

17    allowed to bid on any City contract for two years. This subsection 8.40.170.H shall be construed

18    to provide grounds for debarment separate from, and in addition to, those contained in Chapter

19    20.70 and shall not be governed by that chapter; provided, that nothing in this subsection

20    8.40.170.H shall be construed to limit the application of Chapter 20.70. The Director shall notify

21    the Director of Finance and Administrative Services of all respondents subject to debarment

22    under this subsection 8.40.170.H.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

**8.40.180 Appeal period and failure to respond**

A. An app-based worker or other person who claims an injury as a result of an alleged

violation of this Chapter 8.40 may appeal the Determination of No Violation, pursuant to

Director's Rules.

B. A respondent may appeal the Director's Order, including all remedies issued pursuant

to Section 8.40.170, by requesting a contested hearing before the Hearing Examiner in writing

within 15 days of service of the Director's Order. If a respondent fails to appeal the Director's

Order within 15 days of service, the Director's Order shall be final. If the last day of the appeal

period so computed is a Saturday, Sunday, or federal or City holiday, the appeal period shall run

until 5 p.m. on the next business day.

**8.40.190 Appeal procedure and failure to appear**

A. Contested hearings shall be conducted pursuant to the procedures for hearing

contested cases contained in Section 3.02.090 and the rules adopted by the Hearing Examiner for

hearing contested cases. The hearing shall be conducted de novo and the Director shall have the

burden of proving by a preponderance of the evidence that the violation or violations occurred.

Upon establishing such proof, the remedies and penalties imposed by the Director shall be

upheld unless it is shown that the Director abused discretion. Failure to appear for a contested

hearing shall result in an order being entered finding that the respondent committed the violation

stated in the Director's Order. For good cause shown and upon terms the Hearing Examiner

deems just, the Hearing Examiner may set aside an order entered upon a failure to appear.

B. In all contested cases, the Hearing Examiner shall enter an order affirming, modifying,

or reversing the Director's Order.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

**8.40.200 Appeal from Hearing Examiner order**

A. The respondent may obtain judicial review of the decision of the Hearing Examiner by applying for a Writ of Review in the King County Superior Court within 30 days from the date of the decision in accordance with the procedure set forth in chapter 7.16 RCW as amended, other applicable law, and court rules.

B. The decision of the Hearing Examiner shall be final and conclusive unless review is sought in compliance with this Section 8.40.200.

**8.40.210 Failure to comply with final order**

A. If a respondent fails to comply within 30 days of service of any settlement agreement with the Agency, or with any final order issued by the Director or the Hearing Examiner for which all appeal rights have been exhausted, the Agency may pursue, but is not limited to, the following measures to secure compliance:

1. The Director may require the respondent to post or distribute public notice of the respondent's failure to comply in a form and manner determined by the Agency.

2. The Director may refer the matter to a collection agency. The cost to the City for the collection services will be assessed as costs, at the rate agreed to between the City and the collection agency, and added to the amounts due.

3. The Director may refer the matter to the City Attorney for the filing of a civil action in a court of competent jurisdiction to enforce such order or to collect amounts due. In the alternative, the Director may seek to enforce a settlement agreement, Director's Order, or a final order of the Hearing Examiner under Section 8.40.190.

4. The Director may request that the City's Department of Finance and Administrative Services deny, suspend, refuse to renew, or revoke any business license held or

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    requested by the network company or person until such time as the network company complies

2    with the remedy as defined in the settlement agreement or final order. The City's Department of

3    Finance and Administrative Services shall have the authority to deny, refuse to renew, or revoke

4    any business license in accordance with this subsection 8.40.210.A.4.

5         B. No respondent that is the subject of a final order issued under this Chapter 8.40 shall

6    quit business, sell out, exchange, convey, or otherwise dispose of the respondent's business or

7    stock of goods without first notifying the Agency and without first notifying the respondent's

8    successor of the amounts owed under the final order at least three business days before such

9    transaction. At the time the respondent quits business, or sells out, exchanges, or otherwise

10   disposes of the respondent's business or stock of goods, the full amount of the remedy, as

11   defined in a final order issued by the Director or the Hearing Examiner, shall become

12   immediately due and payable. If the amount due under the final order is not paid by respondent

13   within ten days from the date of such sale, exchange, conveyance, or disposal, the successor shall

14   become liable for the payment of the amount due; provided, that the successor has actual

15   knowledge of the order and the amounts due or has prompt, reasonable, and effective means of

16   accessing and verifying the fact and amount of the order and the amounts due. The successor

17   shall withhold from the purchase price a sum sufficient to pay the amount of the full remedy.

18   When the successor makes such payment, that payment shall be deemed a payment upon the

19   purchase price in the amount paid, and if such payment is greater in amount than the purchase

20   price the amount of the difference shall become a debt due such successor from the network

21   company.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1  **8.40.220 Debt owed The City of Seattle**

2  A. All monetary amounts due under the Director's Order shall be a debt owed to the City

3  and may be collected in the same manner as any other debt in like amount, which remedy shall

4  be in addition to all other existing remedies; provided, that amounts collected by the City for

5  unpaid compensation, liquidated damages, penalties payable to aggrieved parties, or front pay

6  shall be held in trust by the City for the aggrieved party and, once collected by the City, shall be

7  paid by the City to the aggrieved party.

8  B. If a respondent fails to appeal a Director's Order to the Hearing Examiner within the

9  time period set forth in subsection 8.40.180.B, the Director's Order shall be final, and the

10  Director may petition the Seattle Municipal Court, or any court of competent jurisdiction, to

11  enforce the Director's Order by entering judgment in favor of the City finding that the

12  respondent has failed to exhaust its administrative remedies and that all amounts and relief

13  contained in the order are due. The Director's Order shall constitute prima facie evidence that a

14  violation occurred and shall be admissible without further evidentiary foundation. Any

15  certifications or declarations authorized under RCW 5.50.050 as amended containing evidence

16  that the respondent has failed to comply with the order or any parts thereof, and is therefore in

17  default, or that the respondent has failed to appeal the Director's Order to the Hearing Examiner

18  within the time period set forth in subsection 8.40.180.B, and therefore has failed to exhaust the

19  respondent's administrative remedies, shall also be admissible without further evidentiary

20  foundation.

21  C. If a respondent fails to obtain judicial review of an order of the Hearing Examiner

22  within the time period set forth in subsection 8.40.200.A, the order of the Hearing Examiner

23  shall be final, and the Director may petition the Seattle Municipal Court to enforce the Director's

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1   Order by entering judgment in favor of the City for all amounts and relief due under the order of

2   the Hearing Examiner. The order of the Hearing Examiner shall constitute conclusive evidence

3   that the violations contained therein occurred and shall be admissible without further evidentiary

4   foundation. Any certifications or declarations authorized under RCW 5.50.050 as amended

5   containing evidence that the respondent has failed to comply with the order or any parts thereof,

6   and is therefore in default, or that the respondent has failed to avail itself of judicial review in

7   accordance with subsection 8.40.200.A, shall also be admissible without further evidentiary

8   foundation.

9       D. In considering matters brought under subsections 8.40.220.B and 8.40.220.C, the

10  Seattle Municipal Court may include within its judgment all terms, conditions, and remedies

11  contained in the Director's Order or the order of the Hearing Examiner, whichever is applicable,

12  that are consistent with the provisions of this Chapter 8.40.

13  **8.40.230 Private right of action**

14      A. Any person or class of persons that suffers an injury as a result of a violation of this

15  Chapter 8.40, or is the subject of prohibited retaliation under Section 8.40.120, may bring a civil

16  action in a court of competent jurisdiction against the network company or other person violating

17  this Chapter 8.40 and, upon prevailing, may be awarded reasonable attorney fees and costs and

18  such legal or equitable relief as may be appropriate to remedy the violation including, without

19  limitation: the payment of any unpaid compensation plus interest due to the person; liquidated

20  damages in an additional amount of up to twice the unpaid compensation; a penalty payable to

21  the aggrieved party of up to $6,230.88 if the aggrieved party was subject to prohibited

22  retaliation; and other civil penalties and fines payable to any aggrieved party, consistent with

*Template last revised December 2, 2021*                48

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1   Section 8.40.170. Interest shall accrue from the date the unpaid compensation was first due at 12

2   percent per annum, or the maximum rate permitted under RCW 19.52.020 as amended.

3       B. For purposes of this Section 8.40.230, "person" includes any entity a member of which

4   has suffered an injury or retaliation, or any other individual or entity acting on behalf of an

5   aggrieved party that has suffered an injury or retaliation.

6       C. For purposes of determining membership within a class of persons entitled to bring an

7   action under this Section 8.40.230, two or more app-based workers are similarly situated if they:

8           1. Performed services in Seattle for the same network company or network

9   companies, whether concurrently or otherwise, at some point during the applicable statute of

10  limitations period;

11          2. Allege one or more violations that raise similar questions as to liability; and

12          3. Seek similar forms of relief.

13      D. For purposes of subsection 8.40.230.C, app-based workers shall not be considered

14  dissimilar solely because:

15          1. The app-based workers' claims seek damages that differ in amount; or

16          2. The job titles of or other means of classifying the app-based workers differ in

17  ways that are unrelated to their claims.

18      E. An order issued by a court may include a requirement for a network company to

19  submit a compliance report to the court and/or to the Agency.

20  **8.40.233 Waiver**

21  Any waiver by an individual of any provisions of this Chapter 8.40 shall be deemed contrary to

22  public policy and shall be void and unenforceable.

*Template last revised December 2, 2021*                    49

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    **8.40.235 Encouragement of more generous policies**

2        A. Nothing in this Chapter 8.40 shall be construed to discourage or prohibit a network

3    company from the adoption or retention of minimum standards for deactivation policies for app-

4    based workers that are more generous than the minimum standards required by this Chapter 8.40.

5        B. Nothing in this Chapter 8.40 shall be construed as diminishing the obligation of the

6    network company to comply with any contract or other agreement providing more generous

7    minimum standards for deactivation policies for app-based workers than required by this

8    Chapter 8.40.

9    **8.40.240 Other legal requirements—Effect on other laws**

10        A. The provisions of this Chapter 8.40:

11            1. Supplement and do not diminish or replace any other basis of liability or

12    requirement established by statute or common law;

13            2. Shall not be construed to preempt, limit, or otherwise affect the applicability of

14    any other law, regulation, requirement, policy, or standard for minimum deactivation

15    requirements, or other protections to app-based workers; and

16            3. Shall not be interpreted or applied so as to create any power or duty in conflict

17    with federal or state law.

18        B. This Chapter 8.40 shall not be construed to preclude any person aggrieved from

19    seeking judicial review of any final administrative decision or order made under this Chapter

20    8.40 affecting such person. Nothing in this Section 8.40.240 shall be construed as restricting the

21    right of an app-based worker or other person to pursue any other remedies at law or equity for

22    violation of the app-based worker's rights.

1       C. A network company's failure to comply with the provisions of this Chapter 8.40 shall

2  not render any contract between the network company and an app-based worker void or

3  voidable.

4       D. No provision of this Chapter 8.40 shall be construed as providing a determination

5  about the legal classification of any individual as an employee or independent contractor.

6  **8.40.250 Severability**

7  The provisions of this Chapter 8.40 are declared to be separate and severable. If any clause,

8  sentence, paragraph, subdivision, section, subsection, or portion of this Chapter 8.40, or the

9  application thereof to any network company, app-based worker, person, or circumstance, is held

10  to be invalid, it shall not affect the validity of the remainder of this Chapter 8.40, or the validity

11  of its application to other persons or circumstances.

12       Section 3. Section 3.02.125 of the Seattle Municipal Code, last amended by Ordinance

13  126788, is amended as follows:

14  **3.02.125 Hearing Examiner filing fees**

15       A. The filing fee for a case before the City Hearing Examiner is $85, with the following

16  exceptions:

| Basis for Case | Fee in dollars |
|---|---|
| * * * | |
| All-Gender Restroom Notice of Violation (Section 14.07.040) | No fee |
| App-Based Worker Deactivation Rights Ordinance (Chapter 8.40) | No fee |
| App-Based Worker Minimum Payment Ordinance (Chapter 8.37) | No fee |
| * * * | |

17                                 * * *

18       Section 4. The City Council requests that the Office of Labor Standards provide a report

19  back to Council on the implementation of this ordinance by no later than September 1, 2026.

Jasmine Marwaha and Karina Bull
LEG App-Based Worker Deactivation Rights ORD
V5

1    Section 5. Section 2 of this ordinance shall take effect on January 1, 2025.

2    Section 6. This ordinance shall take effect and be in force 30 days after its approval by

3  the Mayor, but if not approved and returned by the Mayor within ten days after presentation, it

4  shall take effect as provided by Seattle Municipal Code Section 1.04.020.

5    Passed by the City Council the ___8th___ day of ___August___, 2023,

6  and signed by me in open session in authentication of its passage this ___8th___ day of

7  _____August_____, 2023.

8    _____

9    President __Pro Tem__ of the City Council

10   ☑ Approved / ☐ returned unsigned / ☐ vetoed this __14th__ day of ___August___, 2023.

11   _____

12   Bruce A. Harrell, Mayor

13   Filed by me this __14th__ day of ___August___, 2023.

14   _____

15   Scheereen Dedman, City Clerk

16  (Seal)

*Template last revised December 2, 2021*          52

**SMC 8.37.070 Network company transparency**

A.  Right to up-front information regarding offers

    1.  A network company shall provide, and/or ensure a customer provides, an app-based worker the following information when facilitating or presenting an offer:

        a.  A reasonable estimate of the engaged time required to complete performance of the offer and, if applicable, the range of time in which the offer can be completed;

        b.  A reasonable estimate of the engaged miles required to complete performance of the offer and the approximate geographic location or locations where work in furtherance of the offer will occur, including pick-up and drop-off locations for offers involving deliveries;

        c.  A guaranteed minimum amount of network company payment for the offer; provided, that it does not fall below the minimum network company payment requirements established in Section 8.37.050 for an offer requiring the amount of engaged time and engaged miles provided in the estimate;

        d.  The amount of any tip that each customer has indicated they will provide, if the network company's online-enabled application or platform enables customers to tip in advance of facilitating or presenting the offer to the app-based worker;

        e.  When performance of an offer requires a stop or stops at business establishments, the names of such businesses;

        f.  To the extent it is reasonably ascertainable, information regarding physical labor required to perform services in furtherance of the offer and accessibility at locations where work will be performed, including but not limited to weights of any goods to be handled; numbers of flights of stairs; and availability of elevators, ramps, and other conditions affecting accessibility. The Director shall issue rules regarding the types of information required to be disclosed, the format of provision of the information, and efforts to ascertain the information that would be considered reasonable; and

g. To the extent it is reasonably ascertainable, the network company shall make available to the app-based worker information that it has about the unsealed contents of each online order. The Director shall issue rules regarding the types of information required to be disclosed, the format of provision of the information, and efforts to ascertain the information that would be considered reasonable.

2. A network company shall not be held responsible for a violation of subsection 8.37.070.A.1 that is attributable solely to incomplete or inaccurate information provided by another party, provided that the network company made a reasonable effort to obtain complete and accurate information.

3. An on-demand offer shall be made available for at least two minutes after the app-based worker has been provided the information described in subsection 8.37.070.A.1.

4. If a network company presents a pre-scheduled offer, or an offer that entails fulfillment of multiple individual online orders, and the network company lacks advance notice of the information in subsections 8.37.070.A.1.b, 8.37.070.A.1.d, 8.37.070.A.1.e, 8.37.070.A.1.f and 8.37.070.A.1.g for that offer, the network company shall provide the app-based worker with such information prior to assigning them work in furtherance of each online order, to the extent it is reasonably ascertainable.

B. Within 24 hours of each offer's performance, or within 72 hours after a cancellation by an app-based worker, a network company shall transmit an electronic receipt to the app-based worker that contains the following information for each unique offer covered by this Chapter 8.37:

1. The app-based worker's total amount of engaged time;

2. The app-based worker's total amount of engaged miles;

3. The app-based worker's compensation, itemized by:

a. Gross network company payment, as well as the method used to calculate payment, including but not limited to amount per minute or amount per mile;

b. Total incentive(s) and the basis for calculating the incentive(s), if applicable;

    c.   Total amount of compensation from tips;

    d.   Total amount of any deductions, itemized by deduction type; and

    e.   Net compensation.

4.   Itemized fees collected from the app-based worker to access the network company's online-enabled application or platform;

5.   The approximate geographic location or locations of the app-based worker's engaged time and engaged miles, including pick-up and drop-off locations for offers involving deliveries; and

6.   Pursuant to rules that the Director may issue, other information that is material and necessary to effectuate the terms of this Chapter 8.37.

C.   On a weekly basis, the network company shall provide written notice to the app-based worker that contains the following information for offers covered by this Chapter 8.37 and which were performed or cancelled with cause, as well as other engagement with the worker platform, during the prior week:

1.   The app-based worker's total amount of engaged time;

2.   The app-based worker's total amount of engaged miles;

3.   The app-based worker's compensation, itemized by:

    a.   Gross network company payment, as well as the method used to calculate payment, including but not limited to amount per minute or amount per mile;

    b.   Total incentives and the basis for calculating the incentives, if applicable;

    c.   Total amount of compensation from tips;

    d.   Total amount of any deductions, itemized by deduction type;

    e.   Net compensation

4.   Total amount of itemized fees collected from the app-based worker to access the network company's online-enabled application or platform;

5.   Pursuant to rules that the Director may issue, other information that is material and necessary to effectuate the terms of this Chapter 8.37.

D.  Within 24 hours of an online order's performance or cancellation with cause, a network company shall transmit an electronic receipt to a paying customer that lists:

   1.  The date and time of completion of the online order;

   2.  The total amount paid to the network company, itemizing all charges, fees, and customer-paid tips. The network company shall clearly designate the amount of tips paid directly to the app-based worker and the amount of charges and fees retained by the company; and

   3.  Pursuant to rules that the Director may issue, other information that is material and necessary to effectuate the terms of this Chapter 8.37.

E.  A network company shall ensure that its customer-facing websites, applications, and platforms do not describe any fees or non-tip charges in a manner that might be reasonably misconstrued as a tip, gratuity, or other payment to the app-based worker. Any interface for accepting customer orders shall clearly reflect the amount of any tip paid to the app-based worker.

F.  A network company shall ensure that all app-based workers have access to the company's tip policy, including but not limited to whether the network company's online-enabled application or platform allows customers to tip in advance of completion of an online order and whether the network company permits customers to modify or remove tips after performance.

G.  A network company shall routinely and affirmatively transmit to the Agency such records as required by rules issued by the Director. The Director shall have the authority to require such aggregated or disaggregated records deemed necessary, appropriate, or convenient to administer, evaluate, and enforce the provisions of this Chapter 8.37. The Director may issue rules requiring that aggregated records be produced as a distribution at defined percentiles. The Director may issue data production rules of general applicability as well as rules specific to on-demand companies. In issuing data production rules, the Director shall consider, among other factors, methods to provide workers with information to make informed choices about platforms on which they may seek work and to provide the public with information to assess the impact of network companies.

   1.  Records for production may include, but are not limited to:

     a.   Records regarding the availability of offers facilitated via the network company platform;

     b.   Records regarding the amount of engaged time and engaged miles;

     c.   The amount of time that app-based workers must spend working or engaged to wait for work without compensation to perform app-based work;

     d.   Records regarding the number of app-based workers who logged onto the worker platform, logged on for the first time in the reporting period, or accepted an offer;

     e.   Per-offer or aggregated app-based worker compensation, including but not limited to network company payments, bonuses, incentives, and tips earned from customers; and

     f.   Any other records that the Director determines are material and necessary to effectuate the purposes of this Chapter 8.37.

2. The Director shall issue rules governing the submission format, security, and privacy protocols relating to the submission of network company records, to the extent permitted by law.

H. A network company shall notify app-based workers at least 14 days prior to making a material change to how network company payment will be calculated.

(Ord. No. 126595, § 2, 2022)

A-64

**8.37.080 Flexibility**

A.　An app-based worker has the right to decide when to make themselves available to work and which offers to accept or reject. A network company shall not subject an app-based worker to an adverse action, nor institute a policy subjecting an app-based worker to an adverse action, for engaging in the following activities:

　　1.　Limiting hours of availability, including but not limited to being logged into the worker platform for limited hours, only at certain hours of the day, or during certain days of the week.

　　2.　Accepting or rejecting any individual offer, any types of offers, or any number or proportion of offers. An app-based worker may indicate rejection of an offer by declining to respond to the offer. A network company shall ensure that its worker platform enables an app-based worker to communicate a rejection of each offer.

B.　A network company shall allow an app-based worker to be logged into the network company's worker platform at any date, time of day, or for any amount of time, except in the following circumstances:

　　1.　Certain instances of deactivation as defined in rules, or other applicable law.

　　2.　Limitations on a maximum amount of consecutive work time to protect worker and public safety.

C.　A network company shall not subject an app-based worker to an adverse action, nor institute a policy subjecting an app-based worker to an adverse action, for cancelling their acceptance of an offer with cause. An app-based worker may cancel their acceptance of an offer with cause (i.e., "cancellation with cause") when any of the following conditions occur:

　　1.　Information provided pursuant to subsection 8.37.070.A.1 was substantially inaccurate; provided, that a customer's alteration of a tip amount shall not constitute grounds for cancellation with cause;

A-65

2. The app-based worker cannot complete performance of the offer because the customer is not present or fails to respond to communications from the app-based worker, the customer's presence or response is required for the app-based work to complete performance of the offer, and the app-based worker has made attempts to contact and/or wait for the customer in accordance with an applicable network company policy, provided that the no-contact or limited-contact deliveries are not considered to require the end customer's presence;

3. Timely completion of the offer has become impracticable due to an unforeseen obstacle or occurrence; or

4. The app-based worker makes a good faith complaint regarding sexual harassment or discrimination that is alleged to have occurred during performance of the offer.

D. For all cancelled offers, network companies shall allow the app-based worker to communicate the reason for cancellation, including but not limited to reasons included in subsection 8.37.080.C, via the worker platform. The network company shall review the stated reason for cancellation for a reasonable time of no less than 72 hours before determining, based on clear and convincing evidence, whether an app-based worker cancelled an offer without cause.

(Ord. No. 126595, § 2, 2022)

**SMC 8.37.100 Notice of rights**

A.  Network companies shall provide each app-based worker with a written notice of rights established by this Chapter 8.37. The Agency shall create and distribute a model notice of rights in English and other languages.

B.  The notice of rights shall provide information on:

1.  The right to the applicable minimum per-minute amount, per-mile amount, and per-offer amount guaranteed by this Chapter 8.37, including a clear statement of the current applicable amounts;

2.  A clear statement as to whether the network company identifies as an on-demand network company, a marketplace network company, or neither, and the corresponding timeframe when engaged time and engaged miles apply for a typical offer from that network company (e.g. upon acceptance by the app-based worker, a reasonable estimate of engaged time mutually agreed upon, or when the app-based worker begins performance), pursuant to Section 8.37.020;

3.  The right to receive the information required to be disclosed by this Chapter 8.37 before accepting an offer and performing services in furtherance of an offer;

4.  The right to flexibility in making themselves available for work and accepting, rejecting, or cancelling offers under this Chapter 8.37;

5.  The right to be protected from retaliation for exercising in good faith the rights protected by this Chapter 8.37; and

6.  The right to file a complaint with the Agency or bring a civil action for violation of the requirements of this Chapter 8.37, including but not limited to a network company's or any person's failure to pay the minimum per-minute amount, per-mile amount, or per-offer amount, and a network company's or other person's retaliation against an app-based worker or other person for engaging in an activity protected by this Chapter 8.37.

7.  The right to a clear statement of the network company's tip policy, including but not limited to whether the network company's online-enabled application or platform allows customers to tip in advance of completion of an online order and whether the network company permits customers to modify or remove tips after performance.

8. The right to a clear statement of the network company's fraudulent use policy pursuant to Section 8.37.090, including where the app-based worker can locate that policy.

C. Network companies shall provide the notice of rights required by subsection 8.37.100.B in an electronic format that is readily accessible to the app-based worker. The notice of rights shall be made available to the app-based worker via smartphone application, email, or online web portal, in English and any language that the network company knows or has reason to know is the primary language of the app-based worker. The Director may issue rules governing the form and content of the notice of rights, the manner of its distribution, and required languages for its translation.

D. Network companies shall file their notice of rights in a written format with the Agency no later than March 13, 2024. The information must also include the registered legal name and trade name of the hiring entity as listed on the hiring entity's Seattle business license tax certificate, and a contact name and information for that hiring entity.

(Ord. No. 126595, § 2, 2022)

**SMC 8.39.100 Notice of rights**

A.  Network companies shall affirmatively provide each app-based worker eligible to accrue paid sick and paid safe time with a written notice of rights established by this Chapter 8.39.

　1.  The Agency may create and distribute a model notice of rights in English and other languages. If the Agency creates a model notice of rights, network companies shall affirmatively provide such notice according to the schedule outlined in subsection 8.39.100.A.2. However, network companies are responsible for providing app-based workers with the notice of rights required by this subsection 8.39.100.A, in a form and manner sufficient to inform app-based workers of their rights under this Chapter 8.39, regardless of whether the Agency has created and distributed a model notice of rights. The notice of rights shall provide information on:

　　a.  The right to paid sick and paid safe time guaranteed by this Chapter 8.39;

　　b.  The amount of paid sick and paid safe time accrual and the terms of its use guaranteed under this Chapter 8.39;

　　c.  The right to be protected from retaliation for exercising in good faith the rights protected by this Chapter 8.39; and

　　d.  The right to file a complaint with the Agency or bring a civil action for violation of the requirements of this Chapter 8.39, including a network company's denial of paid sick time and paid safe time as required by this Chapter 8.39, and a network company or other person's retaliation against an app-based worker or other person for requesting or taking paid sick and paid safe time or otherwise engaging in an activity protected by this Chapter 8.39.

　2.  Network companies shall affirmatively provide each app-based worker eligible to accrue paid sick and paid safe time with the written notice of rights according to the following schedule:

　　a.  For each app-based worker working for the network company as of May 1, 2023, network companies shall provide the notice of rights by May 30, 2023.

b. For each app-based worker hired by the network company after May 1, 2023, network companies shall provide the notice of rights prior to the app-based worker commencing work for the network company.

c. For each app-based worker, network companies shall provide the notice of rights no less than annually.

d. If the accessible system required by subsection 8.39.060.C is used to provide notice of rights, network companies shall affirmatively inform app-based workers where and how to access this information. The Director may issue rules clarifying network company requirements for affirmatively providing notice of rights through the accessible system required by subsection 8.39.060.C.

B. Network companies shall affirmatively provide each app-based worker with written notice of the network company's policy and procedure for meeting the requirements of this Chapter 8.39.

1. The policy and procedure shall provide information on:

a. The app-based worker's right to paid sick and paid safe time under this Chapter 8.39;

b. Whether the network company is using a year other than the calendar year for carry-over of accrued, unused paid sick and paid safe time;

c. The authorized purposes under which paid sick and paid safe time may be used;

d. The manner of providing app-based workers with written notification of the current rate of average daily compensation for use of paid sick and paid safe time, and an updated amount of accrued, reduced, and available paid sick and paid safe time;

e. Prohibitions against retaliation for use of paid sick and paid safe time;

f. If applicable, explanation of:

1) Verification required by the network company for use of paid sick and paid safe time for more than three consecutive days;

2) Shared paid sick and paid safe time program in which an app-based worker may choose to donate paid sick and paid safe time to a co-worker;

A-70

       3)   Policy related to frontloaded paid sick and paid safe time; and

   g.   Other information that is material and necessary to effectuate the terms of this Chapter 8.39, pursuant to Director rules.

C.   Network companies shall provide the notice of rights required by subsection 8.39.100.A and the policy and procedure required by subsection 8.39.100.B in an electronic format that is readily accessible to the app-based worker. The notices shall be made available to the app-based worker via smartphone application or online web portal, in English and any language that the network company knows or has reason to know is the primary language of the app-based worker(s). The Director may issue rules governing the form and content of the notice of rights, the manner of its distribution, required languages for its translation, and requirements for network companies to file their notice of rights in a written format with the Agency.

(Ord. 126788, § 2, 2023.)